412 S.E.2d 795

**Gladys Y. ARNOLDT, et al., Plaintiffs Below, Appellees,**

v.

**ASHLAND OIL, INC., a Corporation, Defendant Below, Appellant.**

No. 19988.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 25, 1991.

Decided Dec. 19, 1991.

---

P. Rodney Jackson, Joshua I. Barrett, Debra L. Hamilton, DiTrapano & Jackson, Charleston, for appellees.

Charles R. McElwee, William C. Porth, Robinson & McElwee, Charleston, Albert H. Parnell, William H. Major III, Freeman & Hawkins, Atlanta, Ga., Rex E. Lee, Carter G. Phillips, Peter D. Keisler, Sidley & Austin, Washington, D.C., for appellant.

WORKMAN, Justice:

Ashland Oil, Inc. ("Ashland") appeals from a $10.3 million judgment returned against it by a Circuit Court of Kanawha County jury on multiple assignments of error. The underlying case was initiated by four plaintiffs [1] based on their allegations that air emissions from an Ashland refinery located in Catlettsburg, Kentucky, interfered with the use and enjoyment of their property. Having reviewed the numerous assignments of error in conjunction with the record, we reverse and remand the decision of the circuit court.

The trial which forms the basis of this appeal was limited to the private nuisance claims of four randomly selected plaintiffs.[2] Those plaintiffs alleged that Ashland's emissions from its Catlettsburg facility constituted a private nuisance as to each of them. Three of the four plaintiffs rented or lived rent-free with relatives who were property owners in the area.

The cumulative jury award of $10.3 million was designated as follows: Ben Newton—$320,000 in compensatory damages and $2 million in punitive damages; Harold Lloyd Lykins—$320,000 in compensatory damages and $2 million in punitive damages; Donald Fuller—$330,000 in compensatory damages and $2.5 million in punitive damages; and Cheryl Sowards—$350,000

in compensatory damages and $2.5 million in punitive damages. Based on more than 250 assignments of error, Ashland moved for judgment notwithstanding the verdict, or, in the alternative, a new trial. Those assignments of error included, *inter alia*, allegations that the jury verdict was based on improper evidence of Ashland's alleged misconduct unrelated to the Catlettsburg plant or its emissions, erroneous instructions regarding the substantive law of private nuisance, erroneous instructions concerning punitive damages, and refusal to permit testimony critical to Ashland's defense. By memorandum order entered on November 9, 1990, the trial court summarily denied Ashland's post-trial motions without addressing the merits of the alleged errors. This appeal arises from the denial of Ashland's requested post-trial relief.

For different reasons, both parties readily concede the importance of this "test" case. Ashland contends that the sheer magnitude of the verdicts rendered below has resulted in the filing of motions to add hundreds of additional plaintiffs to the original complaint.[3] Given the numerous cases arising from the same core allegations of private nuisance, we address the following assignments of error to aid the trial court with respect to the remand and retrial of the plaintiffs' cases and also with respect to those future cases yet to be tried.

■ At the start, we note the trial court's ruling that the substantive law of the State of Kentucky governs this case. Applying *International Paper Co. v. Ouellette*, 479 U.S. 481, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987), this Court previously determined, when ruling on the enforceabil-

1. By agreement of counsel and with the concurrence of the trial court, the court selected these plaintiffs at random from a list of more than 200 plaintiffs, most of whom are citizens of Wayne County, West Virginia, who have filed actions against Ashland in the Kanawha County Circuit Court seeking damages by claiming that their property has been damaged and the quality of their lives diminished by air emissions from Ashland's refinery.

2. A fifth individual, Marjorie Bocook, who was initially chosen to be a plaintiff in this trial was dismissed from the underlying civil action on the fifth day of trial. In response to Ashland's request for a directed verdict against Ms. Bocook, apparently due to her inability to participate in the trial, the trial court entered an order declaring the dismissal to be "without prejudice."

3. The original complaint against Ashland named more than 75 plaintiffs.

ity of a preliminary injunction issued by Judge Kaufman against Ashland, that because Kentucky was the "source state" of the emissions, Kentucky statutory or common law controlled. *See Ashland Oil, Inc. v. Kaufman,* 181 W.Va. 728, 384 S.E.2d 173, 180 & Syl. Pt. 5 (1989). We further clarified that "the procedural law of West Virginia shall be followed when the issues are being litigated in this State's courts." *Id.* at 180.

## NUISANCE LAW

■■■ Under Kentucky law, Ashland's emissions could constitute a private nuisance as to a particular plaintiff only if Ashland's use of its property unreasonably interfered with an individual plaintiff's private use and enjoyment of his or her property such that it caused unreasonable and substantial annoyance and thereby caused the fair market value of the property to be materially reduced. *See George v. Standard Slag Co.,* 431 S.W.2d 711, 715 (Ky. 1968), *overruled on other grounds, Southeast Coal Co., Inc. v. Combs,* 760 S.W.2d 83 (1988). As was recognized in *Louisville Refining Co. v. Mudd,* 339 S.W.2d 181 (Ky. 1960),

the existence of a nuisance must be ascertained on the basis of two broad factors, neither of which may in any case be the sole test to the exclusion of the other: (1) the reasonableness of the defendant's use of his property, and (2) the gravity of harm to the complainant. Both are to be considered in the light of all the circumstances of the case, including [1] the lawful nature and location of the defendant's business; [2] the manner of its operation; [3] such importance to the community as it may have; [4] the kind, volume, time and duration of the particular annoyance; [5] the respective situations of the parties; and [6] the character (including applicable zoning) of the locality.

*Id.* at 186–87; *accord Kentland–Elkhorn Coal Co. v. Charles,* 514 S.W.2d 659, 662–63 (Ky.1974). Instructions applying these factors were drafted and approved by the court in *George. See* 431 S.W.2d at 715.[4]

The trial court refused Ashland's proffered instruction No. 21A which would have apprised the jury of the six factors required by Kentucky law to be considered in determining whether each of the respective plaintiffs had proven the elements of a private nuisance.[5] Instead, the trial court

---

**4.** Two of the instructions approved by the *George* court to address the definition of nuisance were:

1. If you believe from the evidence that in the operation of its slag plant the defendant company, through the release or discharge of impurities into the atmosphere, causes unreasonable and substantial annoyance to the occupants of any of the plaintiffs' properties, and that such impurities would cause substantial annoyance to a person of ordinary health and normal sensitivities, and if you further believe from the evidence that solely by reason of that condition the market value of their properties ... has been materially reduced, then you will find in their favor....

2. In determining whether such annoyance (if any) is unreasonable you shall take into consideration all of the circumstances of the case as shown by the evidence, including the lawful nature and location of the defendant company's slag plant; the manner of its operation; its importance and influence on the growth and prosperity of the community; the kind, volume and duration of such atmospheric pollution (if any); the respective situations of the parties; and the character and development of the neighborhood and locality in which their properties are situated, includ-

ing but not confined to existing zoning laws and regulations applicable to them.

*George,* 431 S.W.2d at 715. With respect to Instruction No. 1, *supra,* the court in *Combs, supra,* ruled that inclusion of the term "solely" in that causation and liability instruction was erroneous. *See* 760 S.W.2d at 84. Explaining its ruling, the *Combs* court stated that "[o]ne who *contributes* to a nuisance is responsible in damages and/or diminution of market value *only* to the extent of his contribution, but the fact that others participate in creating the nuisance does not exonerate the contributor completely." *Id.*

**5.** Ashland's proffered instruction No. 21A read as follows:

The existence of a nuisance must be ascertained on the basis of two broad factors. They are:

(1) The reasonableness of the defendant's use of his property; and (2) the gravity of harm to the complainant. These two factors must be considered in light of all the circumstances of the case, including: —the lawful nature and location of the defendant's business; —the manner of its operation; —its importance to the community; —the kind, volume, time and duration of the alleged annoyance; —the respective situation of the parties; —the charac-

gave the jury the following definitions of private nuisance:

> The term 'nuisance,' which means literally annoyance, may be described as a wrong done to a person by disturbing him or her in the enjoyment of property or in the exercise of a common right.... [A] nuisance may exist in the form of dust or air pollution, odors or anything which disturbs the free use of the plaintiffs' property or renders its ordinary use and occupation uncomfortable or which interferes with the plaintiffs['] right to enjoy his or her property in peace and comfort or to enjoy the ordinary comforts of human existence.

When instructing the jury on awarding damages, the court further expanded its previous definition of nuisance by stating that a plaintiff had "a common right to breathe air free from air pollution."

■ Plaintiffs' response to the trial court's failure to give an instruction regarding the six-part test for determining nuisance during oral argument of this case on appeal was to de-emphasize the test by referring to it as merely a balancing test and to argue that the trial court did in fact instruct the jury to consider all of the evidence.[6] A general instruction to consider all the evidence does not take the place of instructing the jury regarding the required factors to consider when determining whether Ashland had committed a private nuisance against the respective plaintiffs. *See* note 5, *supra.*

■ This Court has previously addressed the trial court's duty to give instructions which "correctly state the law, ... [are] supported by sufficient evidence and ... [are] not repetitious of any other instruc-

tion." *Brammer v. Taylor,* 175 W.Va. 728, 734, 338 S.E.2d 207, 213–14 (1985).

> 'An instruction is proper if it is a correct statement of the law and if there is sufficient evidence offered at trial to support it.' *Jenrett v. Smith,* [173] W.Va. [325], [335], 315 S.E.2d 583, 592–93 (1983). ' "Where [in a trial by jury] there is competent evidence tending to support a pertinent theory in the case, it is the duty of the trial court to give an instruction presenting such theory when requested to do so." ' *McAllister v. Weirton Hospital Co.,* [173] W.Va. [75], [81], 312 S.E.2d 738, 744 (1983) (citations omitted).

*Brammer,* 175 W.Va. at 734, 338 S.E.2d at 214. Since no instruction concerning the six-part balancing test for determining a private nuisance was given to the jury, we find that such omission constitutes reversible error. *See id.*

### Nature/Measure Of Damages Recoverable For A Private Nuisance

■ Under Kentucky law, to award damages in a private nuisance suit, there must first be a finding that the claimed annoyance or interference caused a material reduction in the fair market value of the plaintiff's property.[7] *See George,* 431 S.W.2d at 715. Regarding damages recoverable for nuisance, the court instructed the jury as follows:

> [P]laintiffs are entitled to recover for every injury to person and property which they have suffered as approximate [sic] result of the nuisance in question. It is thus up to you the jury to determine from the evidence what damages, if any,

ter of the locality; and —applicable laws and regulations.
*Louisville Refining Co. v. Mudd,* 339 S.W.2d 181 (Ky.1960).

6. The trial court instructed the jury that "you may take into consideration all the circumstances of the case as shown by the evidence" "[i]n determining whether such annoyance, if any, is unreasonable."

7. Although the parties do not discuss in their briefs whether this nuisance is one of a temporary or a permanent nature, we believe it to be

permanent as that term is defined with regard to nuisance. We include this note because damage calculations differ somewhat for a nuisance that is only temporary in nature. The proper measure of damages for a temporary nuisance, as stated in *Kentland–Elkhorn Coal Co.,* "is the diminution in the value of the use during the continuance of the nuisance, and as to rental property is the reduction in rental value during that period." 514 S.W.2d at 664. *Kentland* also offers further guidance on the distinction between temporary and permanent nuisances. *See id.*

may be awarded to compensate the plaintiff or plaintiffs for a loss of a use of enjoyment of property by reason of the acts of the defendant Ashland Oil Company. You may consider any anxiety, discomfort, or emotional distress, suffered by the plaintiff or plaintiffs in question as approximate [sic] result of the emissions from Ashland's Catlettsburg Refinery.

The court further instructed the jury that the plaintiffs had "a right to recover for any substantial annoyance that harmed [them]."

Plaintiffs urge that the recent case of *Radcliff Homes, Inc. v. Jackson,* 766 S.W.2d 63 (Ky.App.1989), supports their position that all injuries of every nature are recoverable as damages in a nuisance action. *Radcliff,* a decision of Kentucky's intermediate appellate court, references a decision of the Sixth Circuit Court of Appeals in *Kentucky West Virginia Gas Co. v. Lafferty,* 174 F.2d 848 (6th Cir.1949) as stating: " '[A]ccording to Kentucky law, all injuries of every nature, whether real or personal, suffered from a nuisance, whether temporary or permanent, are recoverable as damages.' " 766 S.W.2d at 67 (quoting *Lafferty,* 174 F.2d at 852).

Ashland contends that the *Lafferty* decision was questioned by the Kentucky Court of Appeals (then the name of Kentucky's highest appellate court) in *Kentucky West Virginia Gas Co. v. Matny.* 279 S.W.2d 805, 807 (Ky.1955). Our review of *Matny* indicates, however, that *Lafferty* was only faulted for its "intimat[ion] ... that a separate *suit* for annoyance and discomfort might be maintained under Kentucky law." *Id.* at 807 (emphasis supplied). The *Matny* court explained that "[i]t does not appear that question [of recovering separately for annoyance and discomfort in a nuisance action] was squarely presented in the [*Lafferty* ] case, and the possible remedies suggested in the opinion are not binding on us and appear to be in direct conflict with our cases...." *Id.* The Court in *Matny* proceeded to state that there is no Kentucky authority which holds that there can be an *independent* recovery for annoyance and discomfort in a nuisance action. *Id.* We conclude that *Matny* does not stand for the proposition that damages for annoyance and discomfort are not recoverable in a nuisance action, but instead that such damages can *not* be recovered independently in an action that does not go to the jury on a theory of nuisance.[8]

Any question that *Lafferty* was still good law at the time of the trial of this case was put to rest by the Kentucky Supreme Court—the highest appellate court in the state—in *Combs.* In that decision, the court seems to have reaffirmed, at least indirectly, *Lafferty,* as that case relates to damages recoverable in a nuisance action. *See Combs,* 760 S.W.2d at 84. Accordingly, since Kentucky's highest appellate court referenced *Lafferty* on the issue of damages as recently as 1988 in *Combs,* we must agree with the plaintiffs that Kentucky law previously permitted recovery of personal injuries resulting from a nuisance. We note, however, that effective May 24, 1991, the Kentucky Legislature enacted the following codification of Kentucky law on damages allowable for a private nuisance:

No damages shall be awarded for annoyance, discomfort, sickness, emotional distress, or similar claims for a private nuisance. In the event a claim for injury or damage to a person is asserted in the same proceeding as a claim for damage to the claimant's property caused by a private nuisance, liability for such personal injury or damage shall be determined on the basis of applicable principles of tort law independent of whether the defendant's use of property is found to constitute a nuisance.

Ky.Rev.Stat.Ann. § 411.560(3) (effective May 24, 1991).

We conclude that under Kentucky com-

---

**8.** The plaintiffs in *Matny* were precluded from recovering for nuisance due to a statute of limitations defense. *See* 279 S.W.2d at 806.

mon law[9] at the time this case was tried, plaintiffs in private nuisance claims were entitled to recover for damages to their persons such as annoyance, discomfort, sickness, or emotional distress. The trial court's instruction to the jury properly suggested that it could award damages for such personal injuries.

■ Ashland alleges and plaintiffs do not dispute that they failed to place in evidence any tangible monetary sums from which the relevant reduction or diminution in the value of each respective plaintiff's property interest could reasonably have been deduced. We agree. The record in this case is devoid of any tangible figure from which a material reduction in the fair market value of each plaintiff's property interest[10] could have been calculated for the periods during which each individual was allegedly subjected to a nuisance. Absent this type of evidence, "the court and jury are left to draw entirely on their experience aliunde, or upon naked speculation." *Adams Constr. Co. v. Bentley*, 335 S.W.2d 912, 914 (Ky.1960). Given this lack of evidence regarding damages, the trial court erred in not granting Ashland's motion for a directed verdict on this issue.

### Standing to Sue

■ Kentucky law requires that a person have an "ownership interest" or "possessory interest" in the property alleged to have been affected by the nuisance in order to have standing to bring an action for private nuisance. Ashland ar-

gues that the trial court improperly instructed the jury that a mere occupant of property could recover under Kentucky law for a private nuisance.[11] This instruction was obviously given because three of the four plaintiffs were occupants in the homes of relatives and held no ownership interest in the respective properties.

The issue presented on appeal is whether an occupant qualifies under Kentucky law as having a possessory interest in the occupied property. In *Carter v. Louisville & N. Ry. Co.*, 23 Ky.L.Reptr. 2000, 66 S.W. 1006 (1902), the court flatly rejected the claim that an adult child living with her mother would have a right to recover under a theory of private nuisance. *Id.* The *Carter* court likened an adult relative to a lodger or a guest, who under Kentucky law is not permitted to recover for private nuisance. *See id.*

The concept of a possessory interest necessarily involves more than mere occupancy as is clear from the term's definition found in Black's Law Dictionary:

> Right to exert control over specific land to exclusion of others. Right to possess property by virtue of an interest created in the property though it need not be accompanied by title; *e.g.* right of a tenant for years.

> A possessory interest in land exists in a person who has (a) a physical relation to the land of a kind which gives a certain degree of physical control over the land, and an intent so to exercise such control as to exclude other members of

---

**9.** While plaintiffs do not raise independently the issue of whether Kentucky law controls the issue of damages in this case, we take this up on our own initiative. "The overwhelming weight of authority, recogniz[es] that 'the question of the proper measure of damages is inseparably connected with the right of action[,]'" and accordingly, "the measure of damages for a tort is to be treated as a matter of substance...." *Davenport v. Webb*, 11 N.Y.2d 392, 230 N.Y.S.2d 17, 18, 183 N.E.2d 902, 903 (1962) (quoting *Chesapeake & Ohio Ry. Co. v. Kelly*, 241 U.S. 485, 491, 36 S.Ct. 630, 632, 60 L.Ed. 1117 (1916)). Given the fact that the parties at the outset of this litigation agreed that Kentucky law would control substantive issues combined with the fact that damages are "a matter of substance," there can be no question that Ken-

tucky law controls the issue of damages per the agreement of the parties. *Id.*

**10.** As discussed in the next section, only one of the four plaintiffs owned the property on which he/she resided.

**11.** Rather than address the issue of standing in its own right, the trial court combined the concept with its definition of nuisance when instructing the jury:

> A tenant or occupant—a tenant or occupant of property has a right to freedom from unreasonable interference with his or her use of enjoyment of property if a wrong is done to him or her by disturbing the person in the exercise of a common right to breath[e] air free from air pollution.

society in general from any present occupation of the land; or (b) interests in the land which are substantially identical with those arising when the elements stated in Clause (a) exist. Restatement, Property, § 7.

Black's Law Dictionary 1049 (5th ed. 1979).

In its memorandum order on summary judgment dated May 15, 1990, the trial court gave the following explanation of why it permitted the plaintiffs to maintain a cause of action for private nuisance:

> Under Kentucky case law 'nuisance' 'may be described as a wrong done to one by disturbing him in the enjoyment of his property or *in the exercise of a common right.*' (emphasis added) *Louisville Refining Company v. Mudd,* Ky., 339 S.W.2d 181. Logic requires this case to be interpreted to mean that a common right means the right which is commonly enjoyed by people in the community, with interests like these plaintiffs, to enjoy the common air that they breathe. Accordingly, the five plaintiffs,[12] under the circumstances of the possessory interest in the community, as described by the facts in this case, satisfy the criteria for standing in this lawsuit. (footnote added).

Since three of the four plaintiffs had no ownership or possessory interest in property as they were mere occupants in the homes of relatives, it is clear from the summary judgment order that the trial court relied on this so-called "common right" interest in pollution-free air to grant them standing to pursue their nuisance claims. This Court can find no law to substantiate the trial court's opinion that the plaintiffs had standing to assert a "common right" interest in breathing pollution-free air actionable under a private nuisance claim. The trial court apparently extracted a phrase from the *Louisville Refining Co.* case which was intended to refer to a public nuisance. Even assuming, *arguendo,* the existence of a common right

to breathe air free from air pollution, this case is one of private nuisance and *not* public nuisance. Therefore, the trial court's reasoning is nonetheless flawed on this point.

Kentucky law is clear that adult children as well as other non-owners residing with relatives are likened to lodgers and guests and do not have the requisite ownership or possessory interest necessary to bring an action for private nuisance. Given the fact that plaintiffs Newton, Sowards, and Lykins had no ownership or possessory interest in the property for which they sought nuisance damages, the trial court committed reversible error in ruling that they had standing to pursue claims predicated on private nuisance.

### Causation

■ Ashland contends that plaintiffs failed to meet their burden of proving by a preponderance of the evidence that emissions from Ashland's refinery caused or created a private nuisance as to each of the respective plaintiffs. Specifically, Ashland argues that plaintiffs failed to prove that the conditions of which they complained were caused by Ashland rather than by any of the other numerous industries in the Catlettsburg area.

While we do not find it necessary to address the causation issue to find reversible error in this case, we do note that the causation evidence presented appears very weak. From this Court's review of the record, it appears that even assuming, *arguendo,* that plaintiffs demonstrated by a preponderance of evidence that Ashland, to the exclusion of other corporate entities, was the source of the emittants which allegedly caused damage to plaintiffs, no connection was established between the so-called fingerprinting evidence[13] and the four plaintiffs with respect to location, time, etc. We concur with Ashland's contention that plaintiffs' opinions alone, with-

---

12. *See* n. 2, *supra.*

13. Plaintiffs, through the testimony of an employee of the West Virginia Air Pollution Com-

mission, sought to "fingerprint" the emissions at issue as coming from Ashland's refinery based on particle size and shape, high pH value, and presence of calcium oxide.

out any other credible physical evidence, cannot support a finding of causation.

## PUNITIVE DAMAGES

Under Kentucky law, the award and assessment of punitive damages is controlled by statute. Punitive damages are recoverable "only upon proving, by clear and convincing evidence, that the defendant from whom such damages are sought acted toward the plaintiff with oppression, fraud or malice." Ky.Rev.Stat.Ann. § 411.184(2) (Supp.1990; effective July 15, 1988). Oppression, fraud, and malice are defined as follows:

(a) 'Oppression' means conduct which is specifically intended by the defendant to subject the plaintiff to cruel and unjust hardship.

(b) 'Fraud' means an intentional misrepresentation, deceit, or concealment of material fact known to the defendant and made with the intention of causing injury to the plaintiff.

(c) 'Malice' means either conduct which is specifically intended by the defendant to cause tangible or intangible injury to the plaintiff or conduct that is carried out by the defendant both with a flagrant indifference to the rights of the plaintiff and with a subjective awareness that such conduct will result in human death or bodily harm.

Ky.Rev.Stat.Ann. § 411.184(1)(a)-(c). The same statute further states that its provisions are "applicable to all cases in which punitive damages are sought and [that it] supersedes any and all existing statutory or judicial law insofar as such law is inconsistent with the provisions of this statute." *Id.* at subsection (5).

■ While plaintiffs claim that it is not at all clear that the law of Kentucky has to be applied with regard to punitive damages, when this case was previously before this Court on another matter, we ruled that "the procedural law of West Virginia shall be followed when the issues [interstate pollution disputes] are being litigated in this State's courts." *Kaufman,* 181 W.Va. at 735, 384 S.E.2d at 180. Since the issue of awarding punitive damages is a matter of substantive law rather than procedural law, the law of Kentucky is controlling with regard to punitive damages.

■ The record of this case reveals that the trial court understood that Kentucky law controlled with regard to punitive damages and accordingly instructed the jury consistent with Ky.Rev.Stat.Ann. § 411.184 as the following partial instruction demonstrates:

A plaintiff shall recover punitive damages only upon proving by clear and convincing evidence that the defendant, from whom such damages are sought, acted toward the plaintiff with oppression, fraud, or malice. In this connection, the terms 'oppression', 'fraud', or 'malice' are defined as follows: 'Oppression' means conduct which is specifically intended by the defendant to subject the plaintiff to cruel and unjust hardship. 'Fraud' means an intentional misrepresentation, deceit, or concealment of material fact known to the defendant and made with the intention of causing injury to the plaintiff or plaintiffs. 'Malice' means either conduct which is specifically intended by the defendant to cause tangible or intangible injury to the plaintiff or conduct that is carried out by the defendant both with a flagrant indifference to the rights of the plaintiff and with a subjective awareness that such harm will result in humanly death or bodily harm.

Therefore, members of the jury, I charge you that in order for the plaintiff in this case to recover punitive damages, plaintiff must prove by clear and convincing evidence that the defendant acted toward the plaintiff with oppression, fraud, or malice, as I have defined these terms for you.

Proof by clear and convincing evidence is not the same as proof by preponderance of the evidence. Clear and convincing evidence requires that the party with the burden of proof produce evidence substantially more persuasive than a preponderance of the evidence, but not beyond a reasonable doubt. Thus, under this standard, as the trier of fact, you the

jury must be persuaded that the truth of the plaintiffs' contentions regarding their requests for punitive damages are highly probable.

The court further instructed the jury:

In determining the amount of punitive damages to be assessed, the jury should consider the following factors: the likelihood at the relevant time that serious harm would arise from the defendant[']s misconduct, the degree of the defendant's awareness of that likelihood, the profitability of the misconduct to the defendant, the duration of the misconduct and any concealment of it by the defendant, and any actions by the defendant to remedy misconduct once it became known to the defendant.

This instruction is consistent with and based upon Ky.Rev.Stat.Ann. § 411.186 which controls the assessment of punitive damages under Kentucky law.

Ashland also argues that the trial court committed error by misstating the burden of proof required for punitive damages. With reference to the "clear and convincing evidence" standard required by Ky.Rev. Stat.Ann. § 411.184(2), Ashland notes that the trial court gave the jury three differing instructions on the burden of proof: first, that the proof had to be "by clear and convincing evidence;" then, that the jury could award punitive damages if the plaintiffs succeeded in proving by a "preponderance of the evidence" that Ashland acted with wanton or reckless disregard for their lives, safety or property or was guilty of fraudulent conduct; and, finally, that the same findings had to be made by "a clear preponderance of the evidence." The record establishes that the instructions given to the jury on the issue of punitive damages include statements which define the requisite burden of proof in terms other than the clear and convincing standard. We need not decide at this juncture whether this error was sufficient in and of itself to reverse, since we reverse on other grounds. However, the trial court on remand should carefully and consistently instruct the jury that the standard of evidence required to award punitive damages under Kentucky law is clear and convincing evidence.

Ashland further argues that the trial court erred in permitting the jury to consider and award punitive damages based on the plaintiffs' failure to establish proof that Ashland had acted with specific intent to cause injury. Malice is the only one of the three bases for awarding punitive damages under Ky.Rev.Stat.Ann. § 411.184 which permits punitives to be awarded upon an arguably reduced showing of intent. Although malice is initially defined as conduct specifically intended to cause tangible or intangible injury, a second statutory definition for malice is "conduct that is carried out by the defendant both with a flagrant indifference to the rights of the plaintiff and with a subjective awareness that such conduct will result in human death or bodily harm." Ky.Rev. Stat.Ann. § 411.184(1)(c). Kentucky case law further provides that "[m]alice may be implied from outrageous conduct, and need not be express so long as the conduct is sufficient to evidence conscious wrongdoing." *Fowler v. Mantooth,* 683 S.W.2d 250, 252 (Ky.1984) (citing *Hensley v. Paul Miller Ford, Inc.,* 508 S.W.2d 759 (Ky. 1974)).

At first glance, the alternate definition of malice appears to be an exception to requiring specific intent to cause injury as an element of recovering punitive damages. However, upon examination, the secondary definition of malice still requires "a subjective awareness that such conduct will result in human death or bodily harm." Even the case-law definition that plaintiffs rely upon requires conduct that "is sufficient to evidence *conscious* wrongdoing." *Fowler,* 683 S.W.2d at 252 (emphasis added). The jury in this case did not have before it any substantial evidence of Ashland's conduct which demonstrated a "conscious wrongdoing" necessary to award punitive damages under a theory of malice.[14] Because plaintiffs did not introduce evi-

---

**14.** As earlier stated, there was very little evidence on causation and no evidence on compensatory damages, which obviously would further weaken any claim for punitive damages.

dence which demonstrated a specific intent to cause bodily harm or injury, they likewise failed to demonstrate fraud or oppression toward plaintiffs, the two other bases for awarding punitives under Kentucky law. Accordingly, the punitive damage awards should have been set aside by the trial court.

Ashland raises yet another objection to the award of punitive damages, asserting that the award violated its constitutional rights. Ashland cites to the recent United States Supreme Court decision in *Pacific Mutual Life Insurance Company v. Haslip*, — U.S. ——, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), as authority for the proposition that an award of punitive damages may under certain circumstances constitute a due process violation. The Supreme Court, in *Haslip*, while "conced[ing] that unlimited jury discretion—or unlimited judicial discretion for that matter—in the fixing of punitive damages may invite extreme results," refused to "draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case." *Id.* 111 S.Ct. at 1043. The Court went on to state "that general concerns of reasonableness and adequate guidance from the court when the case is tried to a jury properly enter into the constitutional calculus." *Id.* Ashland contends that the trial court ignored its constitutionally-assigned role of ensuring that the award met due process standards of fairness and rationality by failing to set any objective standards by which the jury was to assess punitive damages and by failing to conduct any meaningful post-trial review of such damages. Ashland argues additionally that a due process violation resulted from the excessiveness of the punitive damage award.

Since we have already determined that there was an inadequate evidentiary basis for the award of punitive damages, we need not address whether Ashland's due process rights were violated as a result of the punitive damage award. Consequently, neither the issue of whether Kentucky law includes adequate safeguards in guiding the fact-finder in assessing punitives or the court on the post-trial review of such dam-

ages, nor the issue of whether the trial court fulfilled its constitutional duty in connection therewith need be addressed at this time. We note additionally that the Kentucky courts have not addressed the issue of whether punitive damage awards made pursuant to Kentucky law survive the constitutional standards announced in *Haslip*. *See* 111 S.Ct. at 1043; *see also Mattison v. Dallas Carrier Corp.*, 947 F.2d 95 (4th Cir.1991) (finding South Carolina law for awarding punitive damages violated defendant's due process rights because law lacked meaningful standards and discussing *Haslip* decision); *Fleming Landfill, Inc. v. Garnes*, 186 W.Va. 656, 667, 413 S.E.2d 897, 908 (1991) (holding in context of West Virginia law that "[p]unitive damages should bear a reasonable relationship to the potential of harm caused by the defendant's actions ..." and outlining factors to be applied by trial courts and appellate courts in awarding and reviewing punitive damage awards).

## BAD ACTS

At the center of Ashland's assignment of error concerning evidence of bad acts is the trial court's decision to permit plaintiffs to: (1) call John R. Hall, Ashland's chief executive officer, as an adverse witness; (2) introduce through Mr. Hall a February 26, 1988, letter from him to area residents; and then (3) impeach Mr. Hall on that letter's contents by evidence of other corporate acts wholly unrelated to the issues in the nuisance case. Excerpts from that letter follow:

Ashland has operated in the Tri–State for 64 years. It is our home. Let me assure you that we would do nothing to endanger the health of our families, our employees or our neighbors.

The statistical data from state air quality monitors show there is no pollution problem at Cooper School and that particulate levels in the area immediately surrounding the refinery are far below allowable levels. This information supports our belief that our refinery operations do not

pose a health risk to the surrounding community.

. . . .

Ashland is proud to be a part of the Tri-State community, and has a long history as a responsible corporate citizen.

As a result of the trial court's ruling concerning admission of the letter and permissive impeachment of Mr. Hall as to its contents, plaintiffs were permitted to elicit testimony from Mr. Hall regarding: (a) jury verdicts [15] made in consolidated civil actions for wrongful discharges in the early 1980's brought by two former employees of Ashland against Ashland and others, including Mr. Hall; (b) a report of an investigation of the collapse of a tank at Ashland's Floreffe, Pennsylvania, facility near Pittsburgh, Pennsylvania; (c) illegal political contributions made by a former chairman of Ashland in the late 1960's and early 1970's; (d) the payment of honoraria to congressmen; (e) an investigation of Ashland's activities in the early 1970's made by the Securities and Exchange Commission; and (f) findings and penalties made not against Ashland Oil, Inc., but against Ashland Chemical, Inc., apparently a separate corporate division of Ashland, by a North Carolina agency for conduct which took place in 1985 and 1986.

▮ The evidentiary rule which controls impeachment is West Virginia Rule of Evidence 607. That rule provides that "[t]he credibility of a witness may be attacked and impeached by any party, including the party calling him." W.Va.R.Evid. 607.[16] Notwithstanding its seemingly broad language, Rule 607 " 'does not free either party to introduce otherwise inadmissible evidence into trial under the guise of impeachment.' " *State v. Collins*, 186 W.Va. 1, 409 S.E.2d 181, 188, and Syl.Pt. 4 (1990)

(quoting *State v. Kopa*, 173 W.Va. 43, 53, 311 S.E.2d 412, 423 (1983)).

▮ In justification of the admission of what Ashland characterizes as bad acts, plaintiffs argue that they had an "absolute right" to use the unrelated corporate conduct of Ashland to impeach Chairman Hall "in anything he said" upon calling him as an adverse witness. The following spattering of comments made in opening and closing arguments demonstrates the emphasis placed on Ashland's unrelated acts by plaintiffs in proving their case:

(1) Ashland had committed crimes, felonies, acts of racketeering, fraud and bribery; (2) Ashland had made illegal campaign contributions 20 years ago; (3) Ashland had bribed an Iranian official to get shipments of oil, which counsel described as a racketeering crime under United States law; (4) Ashland 'greases every politician that will take money' including 'only the good Lord knows who in Frankfort, Kentucky;' (5) Ashland's attitude is to 'do a little greasing, ... pay a little bit of money ... bribe somebody, and everything will be fine;' (6) Ashland's 'solution to this, is to either bribe politicians or have congressmen fly in from Washington, D.C.' and give them honoraria; (7) Ashland 'can grease some palms in Frankfort;' (8) Mr. Hall and Ashland would 'steal a jam sandwich;' (9) if the jury awards punitive damages 'we'll try to figure out a way to have a war chest to fight this battle;' (10) the jury should send a 'message to industry' by awarding punitive damages against Ashland [sic] '[t]hese bribes won't be tolerated;' and (11) the jury should punish Ashland and award the plaintiffs punitive damages in excess of '$10 million' in order to tell Ashland that '[y]ou can't

**15.** The trial court permitted plaintiffs' counsel to question Mr. Hall extensively about the special verdicts in the wrongful discharge actions notwithstanding the fact that the "Final Order and Judgment" entered in those actions (1) vacated and set aside the special jury verdicts; (2) declared that such verdicts shall have no "effect in any proceedings ... in any other court or forum" and shall not "be admissible in evidence or otherwise used to establish the existence of any fact or issue relating to any of the claims

alleged as to any of the named defendants ...," and (3) declared that "[s]ubstantial legal and factual grounds exist to contest the liability of defendants Ashland, Hall ... for each and all of the claims of action alleged against them in the consolidated cases."

**16.** Since matters of evidence are procedural in nature, West Virginia law controls. *See Kaufman,* 181 W.Va. at 735, 384 S.E.2d at 180.

bribe politicians and get by with it' and in order to tell Ashland that '[y]ou can't use your influence in Frankfort to operate without a permit and to commit illegal acts and get by with it. . . .'

Subsequent to trial, in response to Ashland's argument that the statement referencing Ashland's long history as a responsible corporate citizen found in the February 1988 letter was a collateral fact, plaintiffs now claim that this statement "was a fact critical to the Plaintiffs' proof of fraud and deceit by Ashland." Given that the statutory definition of fraud requires an "intentional misrepresentation, deceit, or concealment of material fact known to the defendant and made with the intention of causing injury to the plaintiff[,]" this Court fails to see how a statement which is obviously nothing more than a self-serving opinion regarding Ashland's corporate history could be the basis for establishing the requisite fraudulent conduct toward plaintiffs sufficient to permit an award of punitive damages. Ky.Rev.Stat.Ann. § 411.-184.

It seems clear that the plaintiffs offered Mr. Hall's letter into evidence not to prove any element of their case, but solely in order to have an opportunity to impeach it. Thus, as we explained in *Collins*, plaintiffs were improperly permitted to introduce evidence of Ashland's unrelated past acts "under the guise of impeachment." 186 W.Va. at 8 and Syl. Pt. 4, 409 S.E.2d at 188 and Syl. Pt. 4. This evidence of unrelated acts simply was not relevant to the issues being tried. *See* W.Va.R.Evid. 402. The evidence could alternately have been excluded pursuant to a Rule 403 balancing test. As we stated in *Collins*, a court is required to "determine whether impeachment evidence should be barred because its prejudicial effect outweighs its impeachment value." 186 W.Va. at 9, 409 S.E.2d at 189. The record of this case indicates that the trial judge failed to conduct the balancing inquiry required by West Virginia Rule of Evidence 403. Accordingly, we find that the trial court's failure to exclude evidence of Ashland's unrelated past acts constitutes reversible error.

## INFORMING THE JURY THAT ASHLAND'S MOTIONS FOR DIRECTED VERDICT WERE DENIED

The law is well-settled that counsel is prohibited from arguing to a jury that the court has denied a party's motion for directed verdict or that the court submitted the case to the jury after considering and rejecting such a motion. *See* Annotation, *Propriety and Prejudicial Effect of Counsel's Argument or Comment as to Trial Judge's Refusal to Direct Verdict Against Him*, 10 A.L.R.3d 1330, 1332 (1966). Reversible error is committed when a trial court permits such comments to be made to the jury. *See Sanchez v. Stremel*, 95 Ariz. 392, 391 P.2d 557 (1964); *Robelen Piano Co. v. DiFonzo*, 53 Del. 346, 169 A.2d 240 (1961); *Otis Elevator Co. v. Melott*, 281 P.2d 408 (Okla.1954); *Holston v. Jackson*, 278 S.C. 137, 292 S.E.2d 794 (1982). The reason for such a rule is that jurors, being untrained in the law, are likely to surmise that the denial of such a motion represents a determination by the trial judge that the plaintiffs have, as was argued by plaintiffs' counsel in closing argument, "met the burden."

In closing argument, plaintiffs' counsel, over Ashland's objection, told the jury:

Number One, in regard to the burden of proof and what the plaintiffs have to do, at the end—And you folks are not lawyers; and it's the first trial I think any of you have had, at least in this county. At the end of our case, when we rested outside your presence, ... [Ashland's lawyer] moved that our case be dismissed. He says to his Honor, 'Your Honor, under the best set of circumstances that the plaintiffs have shown, they have not carried the burden of proof, throw them out of court.'; but Judge Kaufman did not do that. We're in court. He said that we have met the burden, insofar as a directed verdict against us; and we went forward.

. . . .

He says to his Honor, 'Judge Kaufman, throw them out of court on their ear on the punitive-damage claim. There's no set of circumstances under

which this jury could award punitive damages.' Judge Kaufman says, 'Denied.' Now we're here. We've met the burden, at least for your consideration; and in regard to punitive damages, we have enough evidence for you to consider that. If we didn't, Judge Kaufman's role is to disallow your consideration of that.

Based on well-established principles of law, it was reversible error to permit plaintiffs' counsel to make these comments regarding the trial court's denial of Ashland's motions for directed verdict.

## REFUSAL TO PERMIT TESTIMONY

Ashland sought to call Lee Thomas, a former administrator of the Environmental Protection Agency ("EPA"), as an expert witness. During the time period when Mr. Thomas was the administrator of the EPA, he was responsible for enforcing the federal environmental laws applicable to Ashland. In addition, the EPA administered the Kentucky air quality regulations promulgated pursuant to the Clean Air Act.

The trial court excluded Mr. Thomas' testimony under Rule 403 of the West Virginia Rules of Evidence without permitting Mr. Thomas to take the witness stand and describe either his testimony or his qualifications. Rule 403 provides that

> [a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of the undue delay, waste of time, or needless presentation of cumulative evidence.

In its proffer to the court, Ashland stated that if permitted, Mr. Thomas would testify that he was responsible for deciding how much of what particular substances could be emitted from the various industries throughout the Tri–State region, in order to protect, with a proper margin of safety, the health of persons residing within the region. According to Ashland, Mr. Thomas would further testify that air quality in the Tri–State region was in compliance with applicable air standards throughout the period of years pertinent to the plaintiffs' claims, and that exposure to such air quality would not present a problem to the health or property of any individual.

Ashland argues that Mr. Thomas' testimony was a critical part of its defense. Specifically, his testimony related to the six factors required by Kentucky law to be balanced in determining the existence of a private nuisance and to the determination of whether plaintiffs were entitled to punitive damages. Had he been permitted to take the stand, Ashland states that Mr. Thomas would have testified that Ashland's use of its property was lawful and that there was no likelihood that serious harm would arise from Ashland's conduct. This testimony, according to Ashland, was directly relevant to any assessment of punitive damages because it would demonstrate that Ashland acted in compliance with environmental law and had no reason to believe that its conduct could cause serious harm. *See* Ky.Rev.Stat.Ann. § 411.186.

In response to these arguments, plaintiffs contend that because Mr. Thomas has academic degrees in areas unrelated to the environmental field, he was properly denied permission to testify as an expert witness.[17] Plaintiffs further argue that it was inappropriate to have a witness testifying concerning whether or not federal laws were violated when this case was brought under state nuisance law rather than under the federal Clean Air Act.

As we noted in *Ventura v. Winegardner*, 178 W.Va. 82, 357 S.E.2d 764 (1987), West Virginia Rule of Evidence 702 liberally allows a witness to testify as an expert:

> 'If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.'

*Id.* 178 W.Va. at 86, 357 S.E.2d at 768 (quoting W.Va.R.Evid. 702). This Court

---

17. Mr. Thomas has degrees in correctional administration, criminal justice, and psychology as well as a masters degree in education and rehabilitation counselling.

recently recognized, however, in *Helmick v. Potomac Edison Co.*, 185 W.Va. 269, 406 S.E.2d 700 (1991) that "[t]he admissibility of testimony by an expert witness is a matter within the sound discretion of the trial court, and the trial court's decision will not be reversed unless it was clearly wrong." *Id.* at syl. pt. 6.

In this Court's opinion, Mr. Thomas clearly passed the test of having "specialized knowledge that will assist the trier of fact." *Ventura*, 178 W.Va. at 86, 357 S.E.2d at 768. Notwithstanding the subject of his academic degrees, Mr. Thomas spent a significant portion of his professional career as an administrator in air pollution matters. From the proffer made by Ashland concerning Mr. Thomas' proposed testimony, it appears to this Court that Mr. Thomas had relevant information critical to Ashland's case that the jury should have been permitted to hear. Specifically, Mr. Thomas' testimony would have addressed at least two of the six factors necessary for determining a nuisance—(1) the lawful nature of Ashland's business and (2) the applicable laws and regulations. *See Louisville Refining*, 339 S.W.2d at 186–87. If the trial court were indeed concerned that the trial waters could get muddied by the injection of testimony concerning federal environmental laws, the trial court could easily have directed Mr. Thomas not to testify regarding those issues. Under the facts as presented in this case, it is our opinion that the trial court abused its discretion in refusing to permit Mr. Thomas to testify.

### VOIR DIRE

Subsequent to trial, Ashland discovered and notified the trial court that Lou Hunt, the foreperson of the jury, had previously been represented by plaintiffs' lead trial counsel, P. Rodney Jackson, in a personal injury action and that she had subsequently requested that he represent her in a medical malpractice action as well. Ashland maintains that Ms. Hunt failed to disclose these facts when asked during voir dire whether she "knew" or had "any business with" any of the lawyers or their law firms, or whether she had ever been a plaintiff in a lawsuit or sought money damages. Ashland further argues that had it

known that Ms. Hunt had not only been a plaintiff in a prior lawsuit, but also that she had retained plaintiffs' counsel to represent her in that action, it certainly would have used one of its peremptory challenges to strike her from the jury if she were not stricken for cause. The trial court when presented with this issue denied Ashland's motion to inquire into the propriety of the juror's misconduct on the grounds that Ms. Hunt's failure to answer truthfully was "not any fault of the process or any fault of Lou Hunt."

In *West Virginia Human Rights Commission v. Tenpin Lounge, Inc.*, 158 W.Va. 349, 211 S.E.2d 349 (1975), this Court held that "meaningful and effective *voir dire* examination" is a requirement of a fair trial; that this procedure must allow counsel "to be informed of all relevant and material matters that might bear on possible disqualification of a juror;" and that such an examination "is essential to a fair and intelligent exercise of the right to challenge either for cause or peremptorily." *Id.* 158 W.Va at 355, 211 S.E.2d at 353. This Court further held that a trial court has an obligation to make further inquiry when it learns that a prospective juror may have given inaccurate responses to material questions during voir dire. 158 W.Va. at 356–57, 211 S.E.2d at 354–55.

In response to this argument, plaintiffs argue, in effect, that by Ms. Hunt's responses to voir dire questions, the ball was placed in Ashland's court and that Ashland failed to make the appropriate inquiries to discover Ms. Hunt's full relationship with Mr. Jackson. Plaintiffs cite syllabus point 8 of *State v. Bongalis*, 180 W.Va. 584, 378 S.E.2d 449 (1989) where this Court held: "Where there is a recognized statutory or common law basis for disqualification of a juror, a party must during voir dire avail himself of the opportunity to ask such disqualifying questions. Otherwise the party may be deemed not to have exercised reasonable diligence to ascertain the disqualification." *Id.* at syl. pt. 8.

The following excerpt is from relevant portions of the voir dire examination pertaining to juror Hunt:

THE COURT: What was your name, again?

JUROR HUNT: Lou Hunt.

THE COURT: And you ought to tell Mr. Jackson and Mr. Parnell what you told me.

JUROR HUNT: I'm originally from Oak Hill, and I know of Mr. Jackson from Debbie's father. He's my lawyer.

THE COURT: That's D.L. Hamilton's father.

JUROR HUNT: Yes.

THE COURT: And he's your present lawyer.

JUROR HUNT: Yes, and I haven't seen Debbie for twenty years; and I haven't seen Rod probably for six.

THE COURT: Would that—Is Pat Hamilton presently your lawyer?

JUROR HUNT: Not really. I haven't used a lawyer for years. I married a lawyer; and that's the time—

THE COURT: I'm not going to hold that against you.

JUROR HUNT: But I haven't seen Pat for years.

THE COURT: Okay. Let me ask you something. Does your previous knowledge of Debbie Hamilton from years ago or your relationship with Pat Hamilton cause you any concern? Do you think you'll look at the case any differently? Would you view the evidence more fairly to her side or against her side, or do you think you'll be fair and view both sides the same?

JUROR HUNT: I don't see why not. I'd like to think I'm too honest for that.

THE COURT: Okay. Would the fact that you've entrusted your confidence to Debbie's father have any bearing on your feelings about Debbie's role in this case?

JUROR HUNT: No. I didn't even recognize Debbie until they called her name.

THE COURT: Do you have any feelings about your ability to give the other side, Mr. Parnell's side, just a fair and independent view of your feelings as you give theirs?

JUROR HUNT: No, I feel that I will look at the evidence.

THE COURT: Okay. Does it give you any concern at all? I mean is it something that concerns you at all?

JUROR HUNT: Not really.

THE COURT: Okay. Did you want to ask any questions?

MR. JACKSON: I have no questions, your Honor.

Plaintiffs cite the following questions posed by Ashland's counsel as evidence that Ashland deliberately chose not to inquire further regarding Ms. Hunt's relationship with Mr. Jackson:

MR. PARNELL: I would like to ask one or two. Do you feel, by virtue of your knowledge of Debbie or Mr. Jackson, that that would cause me to have to do anything more than them in any way to make you give us—

JUROR HUNT: No, sir. I like to think my personal integrity's above that. I will look at the evidence.

MR. PARNELL: Fairly and squarely, and you don't have any prejudice or bias for or—

JUROR HUNT: No. I just like to think that my integrity's too high for that.

MR. PARNELL: Yes, ma'am.

The length of time which had passed between Mr. Jackson's representation of Ms. Hunt and the trial at issue here is not discernible from the record, although Ms. Hunt did indicate that she had not seen him "probably for six" years. Clearly, if either Mr. Jackson or Ms. Hunt was cognizant of the fact that he had previously represented her, he or she had an obligation to reveal such professional relationship. Because the issue was not pursued by the trial court upon Ashland's post-trial motion relating thereto, we have no record upon which to determine the nature of Mr. Jackson's representation of Ms. Hunt or even if Ms. Hunt's failure to respond to the question of prior representation was willful.

Ashland itself, however, is not without fault with regard to the voir dire questioning of Ms. Hunt. We agree with plaintiffs' position that Ashland had a duty to inquire further with specificity concerning Ms. Hunt's relationship with Mr. Jackson, espe-

cially since Ms. Hunt referred to him on a first-name basis and specifically answered that she knew of Mr. Jackson "from ... [D.L. Hamilton's] father." This Court feels that Ashland had both the opportunity and the obligation to determine whether Ms. Hunt's knowledge of Mr. Jackson was limited to an acquaintanceship arising from a shared law practice between Mr. Jackson and Mr. Hamilton.

Although this Court has previously remanded a case for a new trial based on the trial court's failure to make further inquiry upon learning that a prospective juror may have given inaccurate responses to material questions during voir dire, because we are reversing this case on other grounds, we find it unnecessary to make a determination as to whether this issue in and of itself constitutes reversible error. *See Tenpin Lounge*, 158 W.Va. at 356–57, 211 S.E.2d at 354–55.

## PREEMPTION

■ Ashland argues that state-law nuisance suits such as this one constitute unwarranted interference with the objectives of the Clean Air Act. Judge Charles Haden ruled in an April 29, 1989, order that "the presence or the implication of the Clean Air Act in the Plaintiffs' cause of action is insufficient to confer federal question jurisdiction to any action which otherwise states purely state nuisance law claims." We agree with plaintiffs' argument that Ashland's preemption argument was heard and denied by the Federal District Court for the Southern District of West Virginia in connection with Ashland's removal of this case to federal court and its ultimate remand. *See Kaufman*, 181 W.Va. 728, 384 S.E.2d 173. We do not wish to further address this issue.

## MISCELLANEOUS EVIDENTIARY RULINGS

As its final assignment of error, Ashland asserts that the trial court admitted hearsay, speculative, prejudicial, and irrelevant testimony and exhibits in violation of Rules 401, 402, 403, 801, 802, and 803 of the West Virginia Rules of Evidence. Ashland argues that both individually and cumulative-

ly, these errors are reversible in nature and accordingly, warrant a new trial.

■ Ashland cites initially the trial court's decision to permit numerous individuals who were not plaintiffs in this case to testify about particular health problems which they attributed to Ashland's refinery. These individuals include, *inter alia,* Barbara Christian and Louise Prince. The testimony of both Ms. Christian and Ms. Prince included a narration of home videos which included photographs of the Ashland refinery as well as commentary regarding health effects and property damage. Ashland further cites the fact that three of the plaintiffs, Donald Fuller, Cheryl Sowards, and Harold Lykins were permitted to testify concerning health problems that their relatives had experienced which they attributed to Ashland. We agree with Ashland that this testimony, whether offered by or about non-plaintiffs, was not relevant to the underlying private nuisance suit and was therefore inadmissible. *See* W.Va. R.Evid. 401 and 402; *Smith v. Edward M. Rude Carrier Corp.,* 151 W.Va. 322, 151 S.E.2d 738 (1966).

Since a private nuisance suit is a property tort and not a personal tort, the admission of testimony concerning the health-related problems of non-parties is clearly not relevant in that it had no tendency to make the existence of any fact that was of consequence to the determination of any of the individual plaintiff's claims "more probable or less probable than it would be without the evidence." W.Va.R.Evid. 401. Similarly, the evidence introduced through Ms. Christian and Ms. Prince was not relevant insofar as it pertained to the health complaints and property damage of non-plaintiffs. Lack of relevancy is further demonstrated by Ms. Christian's testimony that she had no personal knowledge of what the air quality was with respect to each of the plaintiff's residences on the dates about which she offered testimony concerning emittants reaching her home. Had the videotapes and accompanying commentary been limited to emissions only or to the plaintiffs' alleged property damage, our ruling on relevancy may have been different. We further agree with Ashland

that the introduction of this evidence was unfairly prejudicial to Ashland. *See* W.Va. R.Evid. 403.

 Ashland objects to the testimony offered by witness George A. Hockley, an inspector for the Kentucky Department of Air Quality. Specifically, Ashland argues that Mr. Hockley was permitted to give testimony that was both irrelevant and hearsay regarding reports of complaints made by several residents in the Ceredo–Kenova, Kentucky area. While we do not here determine that the reports are necessarily outside the business records exception to the hearsay rule, we do rule that those reports were not relevant to plaintiffs' claims. *See* W.Va.R.Evid. 402, 803(6). This is true both because the reports about which Mr. Hockley testified did not involve complaints made by plaintiffs and because there was no evidence offered by Mr. Hockley or through any other individual to demonstrate that these same conditions, which were the subject of the reports compiled by Mr. Hockley, were similarly present at the plaintiffs' residences on the relevant dates of the respective complaints. Our ruling on the irrelevancy of Mr. Hockley's testimony is limited to his testimony pertaining to citizen complaints. We do not rule that testimony offered by Mr. Hockley to dispute the lawfulness of Ashland's operation [18] was not relevant, as such evidence clearly pertains to one of the six factors required by Kentucky law to determine the existence of a nuisance.

Based on the foregoing opinion, the order of the Circuit Court of Kanawha County refusing to grant Ashland judgment notwithstanding the verdict, or in the alternative a new trial, is hereby reversed and this matter is remanded to permit a new trial to be held consistent with this opinion.

Reversed and remanded.

---

18. The only testimony of Mr. Hockley's that this Court has been able to cull from the record which concerns an unlawful act pertains to the alleged failure of Ashland to omit reference to certain bypass stacks on a permit application for a catalyst regenerator. The alleged unlawfulness appears to be the installation of the bypass stacks without any pollution control devices.