357 S.E.2d 764

Diane VENTURA

v.

Roy E. WINEGARDNER and John Q. Hammons, Trustees; Roy E. Winegardner and John Q. Hammons, Partners, doing business as Morgan Hills Operating Company, a partnership; Winegardner and Hammons, Inc., a corporation, doing business as the Holiday Inn.

No. 17186.

Supreme Court of Appeals of West Virginia.

May 15, 1987.

David L. Solomon, Solomon & Solomon, Morgantown, for appellant.

Richard E. Hamstead, Hamstead & Hamstead, Morgantown, for appellee.

BROTHERTON, Justice:

In this appeal, the appellant, Holiday Inn, is contesting a judgment entered on a jury verdict rendered in favor of the appellee, Diane Ventura, by the Circuit Court of Monongalia County. We agree with Holiday Inn that there were errors in the conduct of the trial, particularly the failure of the trial court to instruct on assumption of risk and the lack of qualifications of Ventura's damage expert, and we therefore reverse.

On April 27, 1984, Diane Ventura was a college senior and a member of the Rutgers tennis team. That year she had played at the number three position and compiled a 15–4 record. She was staying with the team at the Holiday Inn in Star City, West Virginia, while the team competed in the Atlantic 10 Tennis Tournament being held at West Virginia University. That night fellow members of the team surprised Diane with a water battle. She attempted to run away from her friends, and ran thirty feet beyond a walkway, into an unlit area, and fell over a steep bank. The fall injured her right knee. The injury has shown not to be a crippling one, but it has given her continuing trouble in several areas, such as climbing stairs and running or jumping, and, most notably, has inter-

fered with her ability to play competitive tennis. She sued for negligence in the Circuit Court of Monongalia County. The jury awarded Ventura $147,000 for the injury. Holiday Inn raises several assignments of error which we now discuss.

## I.

Several points of error merit only short discussion.

■ At trial, Holiday Inn attempted to introduce a site plan of its property to show that the steep bank was not on its property. The trial court allowed the site plan to come in, but would not let it be used to· show boundary lines unless the surveyor was present to authenticate it. We find no error in the trial court's ruling. None of Holiday Inn's witnesses could say with certainty that the site plan showed the true boundaries, and the plan itself was ambiguous on that point.

■ Holiday Inn further argues that Ventura had the burden of proving that the hazard, *i.e.*, the steep bank, was on Holiday Inn property or that Holiday Inn had knowledge of the dangerous condition. We agree. The owner of a hotel can only be held liable for failing to warn a guest about a defect on property not his if the property is immediately adjacent to the hotel,[1] the hotel knew or should have known of the defect, and the defect is of such a nature that a reasonable hotel operator would have warned his guests. *See generally* Annotation, *Liability of Operator of Business Premises to Patron Injured by Condition of Adjacent Property*, 39 A.L.R.3d 579 (1971). Nevertheless, in this case it is clear that Holiday Inn knew of the defect. The area was inspected by Holiday Inn's director of safety and was quite open and obvious to all concerned. It was also an obvious hazard. Holiday Inn could hardly argue that it had never noticed the steep embankment a few feet from its property line.

■ Another assignment of error is that Holiday Inn was not allowed to put on evidence that no prior falls of this type had taken place at the embankment. We have had occasion to speak on this subject before. In *Barnett v. Coal & Coke Ry.*, 81 W.Va. 251, 94 S.E. 150 (1917), one of the defendant's employees was crushed by a railroad car which he was pushing through a narrow door in the defendant's shop. We found no error in permitting the defendant's supervisor to testify that he had never heard of any other worker being injured in the same manner. We noted that this tended to prove that the defendant was not negligent in furnishing his employees a reasonably safe place in which to work. 81 W.Va. at 262, 94 S.E. at 154. Holiday Inn's evidence that there was no prior occurrence of this sort at that spot was therefore relevant and should have been admitted into evidence by the trial court.[2]

■ Finally, evidence showed that the Rutgers' women's tennis team often conducted water fights at the hotels where they stayed. During previous matches at other hotels there had been several such fights. On one · occasion certain hotel rooms had to be dried out because the walls were soaked with water. Ventura had participated in some of these fights in the past. A question arises as to the extent of the innkeeper's liability for an injury to a guest caused, at least in. part, by horseplay of the victim and other guests. The general rule is that the hotel must exercise reasonable care to restrain its guests where there is a foreseeable risk of danger. *See, e.g.*, syl. pt. 1, *Connolly v. Nicollette Hotel*, 254 Minn. 373, 95 N.W.2d 657 (1959), aff'd, 258 Minn. 405, 104 N.W.2d 721 (1960).

■ Holiday Inn complains that the omission on the jury form of Ventura's fellow team mates, and their last-minute addition onto the form by the trial court during the jury's deliberations, prejudiced

---

1. *See Stedman v. Spiros*, 23 Ill.App.2d 69, 83, 161 N.E.2d 590, 597 (1959).

2. While relevant, prior nonoccurrence of an accident is relatively weak evidence, and we would not have reversed the case on this issue alone.

Holiday Inn, not allowing them the benefit of the horseplay defense. We disagree. Holiday Inn did not timely request Ventura's team mates to be included on the jury form, and no objection was made to the team mates being added late. It is therefore waived on appeal. *See Konchesky v. S.J. Groves & Sons,* 148 W.Va. 411, 414, 135 S.E.2d 299, 302 (1964).

## II.

 In a more serious assignment of error, Holiday Inn objects to the trial court's refusal of an instruction to the jury on assumption of risk. Generally, a jury instruction should be given if there is evidence in the trial which would support such an instruction and it was requested. *See* syl. pt. 2, *Brammer v. Taylor,* 175 W.Va. 728, 338 S.E.2d 207 (1985). In this case there was evidence to support an assumption of risk defense. The elements of an assumption of risk defense are: (1) knowledge of the danger; (2) an appreciation of the danger; and (3) voluntary exposure to the danger. *See Spurlin v. Nardo,* 145 W.Va. 408, 418–19, 114 S.E.2d 913, 920 (1960). Ventura knew her surroundings, having been a guest at the Holiday Inn during daylight hours and passed the area where the embankment was located going to and from her room. By her own testimony, she went running at a full sprint into a dark, unlit area, with her eyes unadjusted to the night. She testified that her field of vision was only about five feet. While Ventura may not have realized the

specific danger of the embankment, she had to know that running at a fast rate of speed in the dark is a danger—a danger which any reasonable person would appreciate, and to which she voluntarily exposed herself as she ran from her team mates, who sought to throw water on her as they had in the past.

Analogous cases support our holding that assumption of risk is a proper defense in this situation. In *Newell v. Zurich Ins. Co.,* 325 So.2d 745 (La.App.1976), the court upheld a judgment against the plaintiff on the grounds of assumption of risk where the plaintiff had been running across a wet sidewalk with bare feet in rainy weather. The court held that no discussion of the assumption of risk by the plaintiff was necessary. Anyone who runs on a wet sidewalk with bare feet assumes a known and well-understood danger. *See* 325 So.2d at 747. In *Moss v. Atlanta Housing Authority,* 160 Ga.App. 555, 556, 287 S.E.2d 619, 620 (1981), the Georgia Appeals Court held that the plaintiff, a guest at the defendant's building, assumed the risk by walking into an unlit area. This case, with Ventura running into an unlit area on uncertain ground, potentially presents a stronger assumption of risk defense than either of the above cases.

 There being sufficient evidence before the jury from which it could have found an assumption of risk by the plaintiff, the defendant, Holiday Inn, was entitled to an instruction on that defense. It was error for the court to withhold it.[3]

---

3. An error not raised by the parties is the effect of comparative negligence on the assumption of risk defense. There is no general rule among the various jurisdictions on this matter, but instead it varies widely. *See Heft & Heft Comparative Negligence Manual* 52 (1986). Some states still allow the assumption of risk to be a complete bar to recovery. *See, e.g., Maddox v. City of New York,* 66 N.Y.2d 270, 496 N.Y.S.2d 726, 487 N.E.2d 553 (1985). Other states have said that assumption of risk may still be used as a defense under comparative negligence, but that it will reduce and not bar the plaintiff's recovery. *See, e.g., South v. A.B. Chance Co.,* 96 Wash.2d 439, 635 P.2d 728 (1981). Finally, some states have abolished assumption of risk as a separate defense entirely and merged the doctrine into comparative negligence. *See, e.g., Wentz v. Deseth,* 221 N.W.2d 101 (N.D.1974).

In West Virginia, assumption of risk and contributory negligence have traditionally been separate defenses. *See Spurlin v. Nardo,* 145 W.Va. 408, 114 S.E.2d 913 (1960). We noted that the two defenses involve different types of conduct. Nevertheless, we changed the contributory negligence rules to a comparative negligence system in *Bradley v. Appalachian Power Co.,* 163 W.Va. 332, 256 S.E.2d 879 (1979), and we have not since had the opportunity to examine whether this holding would change the rules concerning assumption of risk. However, because the issue was not raised in this case, we decline to decide it and leave that issue for a more appropriate case. *See Pack v. Van Meter,* 177 W.Va. 485, 354 S.E.2d 581, 587, n. 11 (1986).

### III.

Holiday Inn also objects to the various experts used by Ventura to prove her injury. Ventura's experts ran from the top to the bottom of the scale, superbly qualified, qualified, and unqualified. We will examine all three.

█ The most qualified expert Ventura called was Dr. K. Douglas Bowers. Dr. Bowers testified as to the extent of the injury to Ventura's knee. He was an orthopedic surgeon, specializing in sports medicine, who had been practicing nineteen years. He was also the treating physician. Thus, Dr. Bowers could rely on his own observations and a wealth of experience in the narrow specialty of sports medicine over his nineteen years of practice. It was quite fortunate that such a qualified physician was treating Ventura and was available as a witness for trial. Dr. Bowers would qualify under any definition as an expert witness.

█ Two other expert witnesses, Frank Ferrante and Ralph Plummer, lacked the outstanding qualifications exhibited by Dr. Bowers. Nevertheless, they were still qualified as experts. West Virginia Rules of Evidence, Rule 702 liberally allows a witness to testify as an expert:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

Thus, the key test is whether the witness has specialized knowledge that will assist the trier of fact. Dr. Plummer was called to testify that the embankment was not properly guarded. He was a professor of industrial engineering at West Virginia University. He was also the director of the Occupational Health and Safety Engineering Program at WVU, taught courses in safety engineering, and had done consulting work with companies for safety evaluations of their facilities. Nevertheless, he admittedly had not done any specific research with unguarded slopes of the type in question. Despite his lack of specific knowledge of unguarded slopes, it is obvious from his education and background that he would have more than a passing knowledge of the subject. His insights would assist the jury in making a decision.

█ Another witness in the same category is Frank Ferrante. Mr. Ferrante was Ventura's tennis coach in high school. His weakness as a witness is that he did not see her play tennis in college. Therefore, his knowledge of her abilities is based only upon her record in college and his memory of her as a high school player. His qualification as an expert is that he has been intimately involved in tennis since he was nine years old. He currently is sponsoring two players on the professional circuit, and he at one time played on the circuit himself. These strengths, plus a familiarity with Ventura, would make his opinions helpful to the jury. Therefore, he also is qualified as an expert witness.

The last expert called was Thomas Serpento. Mr. Serpento was called to state what Ventura's future earnings would have been as a tennis professional. He had a master's degree in vocational counselling and guidance and was employed by West Virginia University in the capacity of Director of Human Resources on teaching personnel. Mr. Serpento admittedly knew very little about tennis and had no training or experience on the salaries of tennis professionals. To arrive at an opinion, he obtained the May, 1985, issue of *Tennis Week Magazine*, which stated the earnings of the top forty ranked players in the country. He took an average from those figures, testified that a tennis player's productive life on the circuit would be approximately ten years, claimed that he reduced the projected figures to present value, and came up with a figure of $737,317.00.

█ Several errors were made with respect to this witness. First, he was qualified as a vocational expert. No attempt was made to try to qualify the witness as an expert in tennis salaries, for which he

was called to testify.[4] He also testified that the average productive life span of a player on the circuit was ten years. The witness admittedly had little knowledge of tennis. He was not qualified to give this opinion. Further, the witness claimed he reduced the figure to present value, but no showing was made that he knew how to do this, or what interest rate he used or calculations he made. Finally, the whole basis for his opinion was an issue of *Tennis Week Magazine.* Assuming all the foregoing was forgiven, *Tennis Week Magazine* is not the kind of publication on which an expert may base his opinion. Experts may base their opinions on treatises and publications in their professions, but must first show the authoritative nature of the works. *See Apicella v. McNeil Laboratories, Inc.,* 66 F.R.D. 78, 85 (E.D.N.Y.1975); Annotation, *Information Relied On By Experts,* 49 A.L.R.Fed. 363, 371 (1980). While we do not wish to disparage *Tennis Week Magazine,* its purpose is not for the scientific enlightenment of tennis professionals. It is written for the enjoyment of its readers. The figures provided were for the amusement of the readers and not to be relied on in any professional manner. Mr. Serpento admitted that he did not know if the figures were net or gross income. He did not know who prepared the figures or how they were determined.

In summary, Mr. Serpento was not qualified to give an opinion on the issue of lost earnings in this case. It was error to allow him to do so.

For the above reasons, the decision of the Circuit Court of Monongalia County is reversed, and the case is remanded for further proceedings consistent with this opinion.

Reversed and remanded.

4. While a vocational expert may be able to qualify as an expert in salaries for normal occupations, this witness had no training in the field of professional sports.