438 S.E.2d 28

Gregory F. JOHNSON, A Minor, By Karen C. JOHNSON, His Next Friend, Plaintiff Below, Appellant,

v.

GENERAL MOTORS CORPORATION, Defendant Below, Appellee.

Andrew J. JOHNSON, Plaintiff Below, Appellant,

v.

GENERAL MOTORS CORPORATION, Defendant Below, Appellee.

No. 21611.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 15, 1993.

Decided Nov. 23, 1993.

John Preston Bailey, Cheryl Dean Riley, Bailey & Riley, L.C., Wheeling, for appellants.

James· D. Lamp, Kurt E. Entsminger, Lamp, O'Dell, Bartram & Entsminger, Huntington, E. Thom Rumberger, Debra K. Wilkinson, Rumberger, Kirk & Caldwell, Orlando, FL, for appellee.

McHUGH, Justice:

This case is before the Court upon the appeal of Andrew J. Johnson and Gregory F. Johnson, a minor, by Karen C. Johnson, his next friend, the plaintiffs below, from the September 25, 1992 order of the Circuit Court of Marshall County which granted set-offs of a prior settlement against a judgment in a product liability case. The defendant below, General Motors Corporation (hereinafter GMC), has cross-assignments of error from the August 11, 1992 jury verdict in the product liability case. For reasons set forth below, we affirm, in part, and reverse, in part, the circuit court's order.

## I.

Gregory and Andrew Johnson were injured in a two-car accident on March 12, 1988, which occurred on Route 2 in Marshall County. At the time of the accident the boys were riding in the back seat of a 1978 Oldsmobile which was being driven by their father. The accident occurred when a MG convertible, driven by Bradley Bland, crossed the center line and hit the Johnsons' car head on. Both drivers were killed. The boys' mother, who was a passenger in the front seat of the 1978 Oldsmobile, was also injured.

Gregory and Andrew contend that their injuries were more severe because of the lap-only belts they had on than the injuries would have been had the 1978 Oldsmobile been equipped with a lap and shoulder restraint system in the rear seat. Andrew contends that his broken teeth, broken nose, and blow-out fracture of his left eye occurred when he jackknifed over his lap belt and hit his head. Gregory contends that his lap belt severed his stomach muscles, sliced through his large and small intestines and fractured his spine. Gregory is confined to a wheelchair for the most part and has a colostomy.

Gregory and Andrew filed a product liability action against the Estate of Bradley Bland, State Farm Mutual Automobile Insurance Company (hereinafter State Farm) (the Johnson's underinsurance carrier), GMC, and others. Before the trial, the Johnsons received a settlement from the liability insurer for Bradley Bland. The Johnsons also received a settlement from State Farm, their underinsurance carrier, before the trial.

The Johnsons proceeded to trial with their crashworthiness case on three theories: strict liability, negligence, and implied warranty. The Johnsons argued that the lap-only belts were defective since the lap/shoulder belts were more effective and that GMC knew of this defect when the 1978 Oldsmobile

was manufactured. The Johnsons also alleged that GMC failed to warn the car owners of the defect.

On August 11, 1992, the jury returned a verdict for the Johnsons under the strict liability theory and the negligence theory. Gregory was awarded $3,162,500.00, and Andrew was awarded $45,000.00. The trial court, however, set-off from the verdict the settlements the Johnsons received from the Estate of Bradley Bland and State Farm. After the set-off, Gregory received $2,912,-500.00, and Andrew received $0.[1]

It is the set-off which the Johnsons appeal. GMC has cross-assignments of error regarding the product liability trial.

## II.

### The Johnsons' Assignments of Error

First, we will address the Johnsons' two assignments of error regarding the set-off from the jury verdict. For reasons set forth below, we find that the trial court erred when allowing the prior settlements from State Farm and the Estate of Bradley Bland to be set-off against the jury verdict.

### A.

The Johnsons' first assignment of error is that the trial court erred by allowing the prior settlements from the Estate of Bradley Bland and State Farm to be set-off against a "crashworthiness" judgment, which is, by its own terms, not a complete judgment. We find that the trial court did err when it set-off the settlements from the Estate of Bradley Bland and State Farm.

However, before addressing the set-off issue we first need to discuss the history of the crashworthiness doctrine. The doctrine is

complex and has left courts divided in how it is to be applied. A crashworthiness case is a case in which there are two collisions.

In the first phase of the accident, the plaintiff's automobile collides with another automobile or with a stationary object. Most of the property damage results from the first collision, but the occupants of the vehicle usually sustain little or no injury at this stage. Personal injuries occur most frequently in the second collision, in which the occupants are thrown against or collide with some part of their automobile. Courts will hold the manufacturer liable for the plaintiff's loss in the second collision only if defective design of the automobile caused or exacerbated the plaintiff's injury.

Note, *Apportionment of Damages in the "Second Collision" Case*, 63 Va.L.Rev. 475, 476 (1977) (footnote omitted).

The crashworthiness doctrine was first recognized in *Larsen v. General Motors Corp.*, 391 F.2d 495 (8th Cir.1968), and has since been adopted by the majority of jurisdictions. *See* Barry Levenstam and Daryl J. Lapp, *Plaintiff's Burden of Proving Enhanced Injury in Crashworthiness Cases: A Clash Worthy of Analysis*, 38 DePaul L.Rev. 55, 61 (1989). However, the application of the crashworthiness doctrine has caused much controversy. There are two main lines of cases. One line is headed by *Mitchell v. Volkswagenwerk, A.G.*, 669 F.2d 1199 (8th Cir.1982) and the other is headed by *Huddell v. Levin*, 537 F.2d 726 (3d Cir.1976).

In *Mitchell, supra*, the Eighth Circuit held that the plaintiff has the burden of proving that there is a defect and that the defect enhanced the injuries. Once the plaintiff meets that burden the burden shifts to the

---

**1.** Below is a break down of the money owed, awarded and received by the Johnsons:

| | GREGORY | ANDREW |
|---|---|---|
| Medical bills the boys owed | $ 223,227.44 | $ 48,807.62 |
| Medicals jury awarded | $ 112,500.00 | $ 25,000.00 |
| Settlement: | | |
| From Bland Estate | $ 35,714.00 | $ 14,286.00 |
| From Underinsurance | $ 214,286.00 | $ 85,714.00 |
| TOTAL | $ 250,000.00 | $100,000.00 |
| Total jury award | $3,162,500.00 | 45,000.00 |
| Trial court reduced jury award to | $2,912,500.00 | $–0– |

defendants to apportion the damages. On the other hand, the Third Circuit in *Huddell, supra,* held that the plaintiff not only has the burden of proving the defect and the enhanced injury, but the plaintiff must also prove the extent of the injury caused by the defect.[2]

■■ This Court recognized the crashworthiness doctrine and opted to follow the *Mitchell* line of cases in *Blankenship v. General Motors Corp.,* 185 W.Va. 350, 406 S.E.2d 781 (1991). We stated the following in syllabus point 2 of *Blankenship:*

> In West Virginia, to recover on a theory of crashworthiness against the manufacturer of a motor vehicle, it is necessary only to show that a defect in the vehicle's design was *a* factor in causing some aspect of the plaintiff's harm. Once the plaintiff has made this *prima facie* showing, the manufacturer can then limit its liability if it can show that the plaintiff's injuries are capable of apportionment between the first and second collisions; therefore, the burden is

upon the manufacturer to make the allocation.

It is the apportionment issue which is relevant to the set-off issue before us now. For instance, if the jury can apportion the damages, then the injury was divisible and a set-off is not appropriate. However, if the jury is unable to apportion the damages, then the injury is indivisible and since the tortfeasors will then be jointly and severally liable, a set-off is appropriate.

GMC points out that this Court has stated that the "practice of allowing the defendant against whom a verdict is rendered to reduce the damages to reflect any partial settlement the plaintiff has obtained from a joint tortfeasor ... is premised on the principle that a plaintiff is entitled to one, but only one, complete satisfaction for his injury." *Board of Education of McDowell County v. Zando, Martin & Milstead, Inc.,* 182 W.Va. 597, 604, 390 S.E.2d 796, 803 (1990) (citations omitted). Furthermore, GMC points to syllabus point 6 of *Pennington v. Bluefield Orthopedics, P.C.,* 187 W.Va. 344, 419 S.E.2d 8 (1992) which

**2.** Below we quote a list of cases which the Supreme Court of Georgia provided in n. 1 of *Polston v. Boomershine Pontiac–GMC Truck, Inc.,* 262 Ga. 616, 423 S.E.2d 659, 661 (1992) which follow the *Mitchell* rule and the *Huddell* rule:

**Cases consistent with the *Mitchell* rule:**
*Czarnecki v. Volkswagen of America,* 172 Ariz. 408, 837 P.2d 1143 (App.1991);
*Blankenship v. General Motors Corp.,* 185 W.Va. 350, 406 S.E.2d 781 (1991);
*Doupnik v. General Motors Corp.,* 225 Cal. App.3d 849, 275 Cal.Rptr. 715 (3d Dist.1991);
*McDowell v. Kawasaki Motors Corp.,* 799 S.W.2d 854 (Mo.App.1990) (See also *Richardson v. Volkswagenwerk, A.G.,* 552 F.Supp. 73 (W.D.Mo.1982));
*Tafoya v. Sears Roebuck and Co.,* 884 F.2d 1330 (10th Cir.1989) (Colorado);
*Valk Manufacturing v. Rangaswamy,* 74 Md. App. 304, 537 A.2d 622 (1988);
*General Motors Corp. v. Edwards,* 482 So.2d 1176 (Ala.S.Ct.1985);
*Shipp v. General Motors,* 750 F.2d 418 (5th Cir.1985) (Texas);
*McLeod v. American Motors Corp.,* 723 F.2d 830 (11th Cir.1984) (Florida);
*Fouche v. Chrysler Motors Corp.,* 107 Idaho 701, 692 P.2d 345 (1984);
*Lee v. Volkswagen of America, Inc.,* 688 P.2d 1283 (Okla.S.Ct.1984);
*Sumnicht v. Toyota Motor Sales, U.S.A., Inc.,* 121 Wis.2d 338, 360 N.W.2d 2 (1985);
*Mitchell v. Volkswagenwerk, A.G.,* 669 F.2d 1199 (8th Cir.1982) (Minnesota);

*Buehler v. Whalen,* 70 Ill.2d 51, 15 Ill.Dec. 852, 374 N.E.2d 460 (1977);
*Chrysler Corp. v. Todorovich,* 580 P.2d 1123 (Wyo.S.Ct.1978) (See also *Harvey v. General Motors Corp.,* 873 F.2d 1343 (10th Cir.1989) (Wyoming));
*May v. Portland Jeep, Inc.,* 265 Or. 307, 509 P.2d 24 (1973);
*Engberg v. Ford Motor Co.,* 87 S.D. 196, 205 N.W.2d 104 (1973);
**Cases consistent with the *Huddell* rule:**
*Armstrong v. Lorino,* 580 So.2d 528 (La.Ct.App. 1991);
*Crispin v. Volkswagenwerk, A.G.,* 248 N.J.Super. 540, 591 A.2d 966 (App.Div.1991) (See also *Huddell v. Levin,* 537 F.2d 726 (3d Cir. 1976));
*Garcia v. Rivera,* 160 A.D.2d 274, 553 N.Y.S.2d 378 (App.Div. 1st Dep't.1990) (See also *Caiazzo v. Volkswagenwerk A.G.,* 647 F.2d 241 (2d Cir.1981));
*Craigie v. General Motors Corp.,* 740 F.Supp. 353 (E.D.Pa.1990);
*Duran v. General Motors Corp.,* 101 N.M. 742, 688 P.2d 779 (App.1983);
*Wernimont v. International Harvester Corp.,* 309 N.W.2d 137 (Iowa Ct.App.1981);
*Seese v. Volkswagenwerk, A.G.,* 648 F.2d 833 (3d Cir.1981);
*Stonehocker v. General Motors Corp.,* 587 F.2d 151 (4th Cir.1978);
*Dreisonstok v. Volkswagenwerk, A.G.,* 489 F.2d 1066 (4th Cir.1974).

states: "A setoff or verdict credit is appropriate in cases in which any tortfeasors, whether they be characterized as joint or successive and independent, are 'jointly responsible' for a single indivisible injury." GMC's strongest argument is the *Pennington* case; however, the principle established in syllabus point 6 of *Pennington* does not neatly apply to the crashworthiness case.[3]

The crux of this issue is whether the jury can apportion the enhanced injuries received from the defective seatbelt from the injuries received in the car accident. Commentators differ on how the courts should address that issue since a crashworthiness case is a unique case where traditional rules do not resolve the issue of damages.

Neither the existing law of joint and concurrent tortfeasors nor the *Huddell* ... [decision] adequately resolve the apportionment issues. Principles of liability concerning joint tortfeasors are extremely difficult to apply to this unique cause of action. If extended to the second collision case, existing law would improve enormously the plaintiff's chances for full recovery, but often would result in excessive manufacturer liability and unnecessarily higher prices for consumers. The solution proposed by *Huddell v. Levin* ... is equally unsatisfactory. By imposing the often formidable burden of apportioning damages on the plaintiff, *Huddell* ... protect[s] the manufacturer from excessive liability at a very high cost to the interests of the plaintiff and society. The approach taken by the Third ... [Circuit] would 'abandon the injured party to his dismal fate as a traffic statistic,' the very outcome *Larsen* [*v. General Motors*, 391 F.2d 495 (8th Cir.1968) ] wished to avoid.

Requiring apportionment of damages and placing the burden of apportionment on the manufacturer will achieve the best balance of the policy considerations.

*Apportionment of Damages in the "Second Collision" case, supra* at 500–01.

We agree with the above article that the existing law of joint and concurrent tortfeasors does not adequately resolve the apportionment issue in a crashworthiness case. *See also Huddell*, 537 F.2d at 738 ("Analogies to concurrent actions combining to cause a *single impact* are simply not applicable."). We recognize that apportionment may be very difficult. However, "[t]he obstacles of apportionment are not insurmountable." *Larsen*, 391 F.2d at 503. Furthermore, we already have the jury apportion damages among joint tortfeasors in comparative negligence.

In the case before us the following instruction requested by GMC was read to the jury:

With reference to a crashworthiness case, you are to bear in mind that the injuries resulting from the initial collision need be distinguished from those which are alleged to have occurred or to have followed due to any alleged defect rendering the vehicle uncrashworthy. In this case, the first collision occurred when the red MG driven by Bradley Bland went out of control, crossed the center line and collided head-on with the Johnson vehicle.

On the other hand, the manufacturer would not be responsible for *all* injuries resulting from the collision. The Plaintiffs must first establish that the alleged defect was a factor in causing some aspect of Plaintiffs' injuries. If the alleged defect was not a factor, Plaintiffs may not recover from the manufacturer. If the alleged defect is proven by Plaintiffs by a preponderance of the evidence to have been a factor in causing Plaintiffs' injuries, then the manufacturer can limit its liability by showing that Plaintiffs' injuries are capable of apportionment between the initial collision and any injury enhanced by the alleged defect. Then the manufacturer is only liable for that portion of Plaintiffs'

**3.** In *Pennington, supra,* the plaintiff injured her right clavicle in a car accident. After the car accident the plaintiff's right clavicle was further injured by negligent medical treatment. The plaintiff settled with the driver of the car. Next, the plaintiff sued the medical doctor who treated her right clavicle and collected a malpractice judgment. After the trial the physician and hospital requested that the earlier settlement be set-off from the malpractice judgment. This Court held that a set-off was appropriate because the tortfeasors were jointly responsible for a single indivisible injury.

damages that are over and above that which would probably have occurred absent the alleged defect. Furthermore, Defendant can only be held liable for such enhanced injuries which were proximately caused by the alleged defect in the design of the product.

General Motors' Requested Jury Instruction No. 10. Furthermore, the jury verdict form stated, in part, that "[i]n assessing damages you may omit, if you choose, those damages which you believe that the defendant has proven were not enhanced or increased by the absence of a shoulder belt in the vehicle."

The record indicates that the jury did apportion the damages. A review of the medical expenses shows that the jury only made GMC responsible for approximately one-half of the medical bills rather than for the entire amount. For instance, Gregory Johnson owed $223,227.44 in medical bills; however, the jury only awarded him $112,500.00 for his medical expenses. Similarly, Andrew Johnson owed $48,807.62 in medical bills; however, the jury only awarded him $25,000.00 for his medical expenses. *See* n. 1, *supra.* Since the jury apportioned the damages a set-off is inappropriate. If the jury was unable to apportion the damages then a set-off would have been appropriate.

■ Accordingly, we hold that when a plaintiff seeks to recover damages on a theory of crashworthiness against the manufacturer of a motor vehicle, and the manufacturer requests that the jury apportion the damages between the first and second collisions, and the jury does so, the prior settlements between the plaintiff and the other defendants will not be set-off from the jury verdict.[4]

## B.

■ The Johnsons' second assignment of error is that the settlement under the underinsurance policy (from State Farm) is a collateral benefit; therefore, it may not be set-off against the judgment. We agree with the Johnsons.

At the outset we note that this Court stated in syllabus point 1 of *Cox v. Turner,* 157 W.Va. 802, 207 S.E.2d 152 (1974) that "[u]nder statutory Uninsured Motorist Coverage neither a settlement by the insurance company with a victim nor satisfaction by an insurance company of a judgment in favor of the victim against the uninsured motorist may be considered compensation from a 'collateral source.'" This Court relied on *W.Va. Code,* 33-6-31 [1931] when writing the *Cox* decision. However, since *Cox* was written, *W.Va.Code,* 33-6-31(b) has been amended. *W.Va.Code,* 33-6-31(b) [1988] now provides, in pertinent part, that an automobile policy shall provide an option for uninsured or underinsured coverage up to the amount of the bodily injury liability coverage and property damage liability coverage "without setoff against the insured's policy or any other policy." *W.Va.Code,* 33-6-31(b) [1988] further states, in part, that "[n]o sums payable as a result of underinsured motorists' coverage shall be reduced by payments made under the insured's policy or any other policy." When *Cox, supra,* was written in 1974, *W.Va.*

4. We recognize that other courts have held in crashworthiness cases that "whether or not the harm to the plaintiff is capable of apportionment among two or more causes is a question of law." *Mitchell,* 669 F.2d at 1208 (emphasis omitted). *See also Richardson v. Volkswagenwerk, A.G.,* 552 F.Supp. 73, 83 (W.D.Mo.1982). Other courts have also attempted to establish a bright line rule that death, paraplegia, etc., are incapable of apportionment in crashworthiness cases. *E.g., Fox v. Ford Motor Co.,* 575 F.2d 774 (10th Cir.1978) and *Richardson, supra.* However, we decline to adopt such a rule.

As we pointed out a crashworthiness case is a unique case. Because of its uniqueness, absent special circumstances, the jury should be the one to determine whether or not the damages can be apportioned.

Furthermore, a bright line rule does not make sense in the case before us. For instance, one of the plaintiffs in the case before us is paralyzed; however, the evidence makes it clear that the lap belt caused this injury since it sliced through his intestines and fractured his spine. However, the plaintiffs could have still been injured even with the combination lap and shoulder restraint system. Obviously, reasonable minds can differ as to what the difference in injuries would have been had the plaintiffs had on shoulder and lap belts rather than lap-only belts. Therefore, it was proper for the jury to decide whether or not GMC showed that the damages were capable of being apportioned, and if so, what the amount of damages should be.

*Code*, 33–6–31 did not state that a set-off due to the payment of uninsured or underinsured benefits was improper. Since *Cox* was written, the legislature has decided that a set-off in this situation is improper. *See also State ex rel. Allstate Insurance Co. v. Karl*, 190 W.Va. 176, 437 S.E.2d 749 (1993). Therefore, syllabus point 1 of *Cox, supra*, no longer reflects the legislature's current analysis of uninsured and underinsured benefits. This interpretation is further supported by this Court's analysis of the collateral source rule in more recent years.

■ In syllabus point 7 of *Ratleif v. Yokum*, 167 W.Va. 779, 280 S.E.2d 584 (1981) this Court stated that "[t]he collateral source rule normally operates to preclude the offsetting of payments made by health and accident insurance companies or other collateral sources as against the damages claimed by the injured party." We further stated in *Ratlief* that "[t]he collateral source rule was established to prevent the defendant from taking advantage of payments received by the plaintiff as a result of his own contractual arrangements entirely independent of the defendant. Part of the rationale for this rule is that the party at fault should not be able to minimize his damages by offsetting payments received by the injured party through his own independent arrangements." *Id.* at 787, 280 S.E.2d at 590.

Furthermore, other jurisdictions have found that uninsured and underinsured benefits are subject to the collateral source rule. *See Lomax v. Nationwide Mutual Ins. Co.*, 964 F.2d 1343 (3d Cir.1992); *Beaird v. Brown*, 58 Ill.App.3d 18, 15 Ill.Dec. 583, 373 N.E.2d 1055 (1978); *Estate of Rattenni v. Grainger*, 298 S.C. 276, 379 S.E.2d 890 (1989); and *Bradley v. H.A. Manosh Corp.*, 157 Vt. 477, 601 A.2d 978 (1991). *But see Fertitta v. Allstate Ins. Co.*, 462 So.2d 159 (La.1985).

■ In the case before us, it would be unfair for GMC to minimize its damages by offsetting the underinsurance settlement the Johnsons received as a result of their own contractual arrangements. Accordingly, we hold that the collateral source rule operates to preclude the offsetting of uninsured or underinsured benefits since the benefits are the result of a contractual arrangement which is independent of the tortfeasor; therefore, we overrule syllabus point 1 of *Cox v. Turner*, 157 W.Va. 802, 207 S.E.2d 152 (1974) which held that uninsured motorist benefits were not a collateral source under the then existing statutory scheme.

### III.

#### *GMC's Cross–Assignments of Error*

Now we will address GMC's three cross-assignments of error. For reasons set forth below we affirm the trial court's decision on all three of GMC's cross-assignments of error.

#### A.

First, we address GMC's contention that the trial court erred in allowing evidence, argument and instruction regarding GMC's post-sale duties to warn. GMC contends that the defect must be present when the product is manufactured in order for it to have a duty to warn of the defect. GMC's argument involves two different analysis: (1) was the instruction on the elements of the duty to warn under a negligence theory proper, and (2) did the evidence in this case support the jury's finding that the 1978 Oldsmobile was defective at the time it was manufactured.

■ First, we will address the jury instructions. Below is an excerpt from the trial transcript of the jury instructions read by the judge to the jury on the issue of GMC's duty to warn under a strict liability theory and under a negligence theory:

The Plaintiffs also allege that the automobile contained a defect which contributed to Plaintiff's injuries beyond those which would have otherwise occurred in the collision. This legal theory is often referred to as 'failure to warn[.]'

Specifically, failure to warn refers to the allegation that a product is defective because it does not contain adequate labels, instructions, or warnings.

As to the theory of crashworthiness or enhanced injury, however; in order for

Plaintiffs to prove that the product was defective because of a lack of labels, instruction, or warnings, the product is to be tested by what the reasonably, prudent manufacturer should have done, having in mind the general state of the art of the manufacturing process, including design, labels, and warnings, as it relates to economic costs, at the time the product was made.

If you determine from the evidence that General Motors knew or ought to have known in 1978 that, by reason of lack of lap shoulder belts in the rear seat of the Oldsmobile was not reasonably safe, absent an adequate warning; that such warning was feasible; that it was not given, and that it was this feature of the product that caused the injuries, your verdict may be against General Motors and in favor of the Johnsons.

If you find from the evidence that the rear seat lap belts alleged to have caused Plaintiff's injuries, by reason of a defect present when it left the hands of General Motors, was not reasonably safe for its normal use and that the Defendant failed to exercise due care in its design and manufacture, and if you also find that the defect was a substantial factor in causing the injuries, you may find for the Plaintiff, Andrew and Gregory Johnson.

*If you believe from the evidence that General Motors had reason to know of risks in use of the product, risks which only came to its knowledge after the product had left its control and that it failed to take steps that a reasonably, prudent manufacturer would take to warn users of these risks, you may find them to be liable for any resulting harm.*

(R. at 1449–51) (emphasis added). GMC only complains about the underlined portion of the above instructions. GMC states that it was error for the judge to read the underlined portion regarding the duty to warn under a negligence theory because it fails to instruct the jury that the defect must exist at the time the product was made.

The Johnsons, on the other hand, contend that there is a difference between the duty to warn under a negligence theory and the duty to warn under a strict liability theory, and under the negligence theory the underlined portion of the above instructions was proper since under the negligence theory the duty to warn continues even after the product is sold.[5] The Johnsons also argue that this issue is moot since the jury found GMC responsible under a strict liability theory which the judge properly instructed requires the defect to be present when the product is manufactured. We agree that the issue is moot.

The difficulty with this issue is that the following jury verdict form, in part, is not clear:

---

5. We have set boundaries for the duty to warn in product liability cases which are tried under a strict liability theory:

> We stated in *Morningstar [v. Black and Decker Mfg. Co.,* 162 W.Va. 857, 253 S.E.2d 666 (1979)] that product unsafeness arising from failure to warn 'is to be tested by what the reasonably prudent manufacturer would accomplish in regard to the safety of the product, having in mind the general state of the art of the manufacturing process, including design, labels and warnings, as it relates to the economic costs, at the time the product was made.' 162 W.Va. at 888, 253 S.E.2d at 682–83 (1979).

*Ilosky v. Michelin Tire Corp.,* 172 W.Va. 435, 443, 307 S.E.2d 603, 611 (1983). However, we have not addressed the issue of whether the duty to warn under a negligence theory in a product liability case differs, and if so, how.

One commentator noted that most courts have held that a seller has a post-sale duty to warn. Robert A. Royal, *Post Sale Warnings: A Review and Analysis Seeking Fair Compensation Under Uniform Law,* 33 Drake L.Rev. 817, 831–32 (1983–84). However, "[t]he scope and definition of that warning ... varies, rendering the formulation of black letter law difficult." Royal, *supra* at 832.

## VERDICT FORM

1. Do you find that the 1978 Oldsmobile was defective, either due to the lack of lap-shoulder belts in the rear seat or due to General Motors' failure to warn about the risks of lap-only belts?

Yes___X___
No_____

2. Do you find that General Motors was negligent?

Yes___X___
No_____

3. Do you find that General Motors breached its implied warranty?

Yes_____
No___X___

IF YOUR ANSWER TO ALL THREE QUESTIONS ABOVE IS NO, THEN YOU NEED PROCEED NO FURTHER; SIGN AND DATE THIS JURY VERDICT FORM AND REPORT YOUR VERDICT TO THE COURT.

_____ _____
 Foreperson Date

IF YOU HAVE ANSWERED YES TO ANY ONE OF THE THREE QUESTIONS ABOVE, THEN PROCEED TO QUESTION NO. 4.

4. Do you find from a preponderance of the evidence that this defect or negligence or breach of warranty proximately caused the injuries of which Gregory and Andrew Johnson complain?

Yes___X___
No_____

_____

There was no separate interrogatory which enabled the jury to indicate whether or not GMC had a duty to warn. The only mention of a duty to warn was in the disjunctive: "1. Do you find that the 1978 Oldsmobile was defective, either due to the lack of lap-shoulder belts in the rear seat *or* due to General Motors' failure to warn about the risks of lap-only belts?" (emphasis added) Therefore, it is impossible to tell from the first interrogatory whether the jury found GMC liable under a strict liability theory [6] or under a duty to warn theory.

We stated the following in syllabus point 6 of *Orr v. Crowder*, 173 W.Va. 335, 315 S.E.2d 593 (1983), *cert. denied*, 469 U.S. 981, 105 S.Ct. 384, 83 L.Ed.2d 319 (1984):

Where a jury returns a general verdict in a case involving two or more liability issues and its verdict is supported by the evidence on at least one issue, the verdict will not be reversed, unless the defendant has requested and been refused the right to have the jury make special findings as to his liability on each of the issues.

In *Orr* this Court explained the rationale for its holding in syllabus point 6:

[W]e fail to see the logic of a rule that requires a general verdict supported by one good theory of liability to be set aside. We are aware of no presumption that requires a court to assume that the jury has returned the verdict on the cause of action that was not supported by sufficient evidence. It must be remembered that in a civil case the burden of proof in order to prevail is only by a preponderance of the evidence.

*Id.* at 349, 315 S.E.2d at 607.

In the case before us, the verdict is supported by the evidence under the strict liabil-

6. Although it is not clear, we assume that the first interrogatory concerns the strict liability theory since both parties concede that GMC was liable under both a negligence theory and a strict liability theory. The other interrogatories concern negligence, implied warranty, and proximate causation. Therefore, the first interrogatory is the only one left which would allow the jury to find GMC responsible under strict liability.

ity theory. GMC does not complain that it requested and was refused a separate finding by the jury on the duty to warn. If GMC had wanted to make the jury findings clearer it could have submitted a special interrogatory or verdict form to require the jury to state under which theory of the duty to warn, if any, the jury found GMC liable. *See Id.* at 349, 315 S.E.2d at 607. However, GMC chose not to make the jury's findings clear. Furthermore, we point out that although GMC complains that one instruction was erroneous, the jury was properly instructed on several other theories of liability: strict liability, negligence, and the duty to warn under a strict liability theory. Therefore, under syllabus point 6 of *Orr, supra,* we will not reverse the jury verdict since the jury was properly instructed under the strict liability theory, and since it is impossible to tell under which theory of duty to warn, if any, the jury found GMC liable.

Next, we address whether the evidence in the case before us supports the jury's finding that the 1978 Oldsmobile was defective at the time it was manufactured. We find that the evidence does support the jury's findings.

 At the outset we note that we have stated that "[w]hen a case involving conflicting testimony and circumstances has been fairly tried, under proper instructions, the verdict of the jury will not be set aside unless plainly contrary to the weight of the evidence or without sufficient evidence to support it." Syl. pt. 4, *Laslo v. Griffith,* 143 W.Va. 469, 102 S.E.2d 894 (1958). *See also* syl. pt. 2, *McNeely v. Frich,* 187 W.Va. 26, 415 S.E.2d 267 (1992). We have further indicated that

'[i]n determining whether the verdict of a jury is supported by the evidence, every reasonable and legitimate inference, fairly arising from the evidence in favor of the party for whom the verdict was returned, must be considered, and those facts, which the jury might properly find under the evidence, must be assumed as true.' Syllabus point 3, *Walker v. Monongahela Power*

*Company,* 147 W.Va. 825, 131 S.E.2d 736 (1963).

Syl. pt. 3, *McNeely, supra.*

 GMC contends that the evidence showed that there was no requirement by the National Highway Transportation Safety Administration for the Oldsmobile to be equipped with rear seat lap and shoulder belts in 1978. GMC points out that the National Highway Transportation Safety Administration never issued a recall or warning regarding rear restraint systems. In fact, it was not until 1990 that lap and shoulder belts were required in the rear seats of all new cars sold in the United States.

However, the judge gave the following instruction to the jury:

In the course of the trial of this lawsuit, evidence has been introduced to the effect that the vehicle, manufactured and sold by Defendant, complied with certain Federal Motor Vehicle Safety Standards established by the National Highway Transportation Safety Administration.

With respect to those Federal Motor Vehicle Safety Standards, you are instructed that compliance by a manufacturer with federal standards, existing at the time the product was manufactured and prescribing standards for design, inspection, testing, or manufacture of a product, is a factor which you may take into consideration in determining whether the car was defective. It is not of itself conclusive either way.

I charge you that industry standards are not conclusive as to ordinary care and design or manufacture, but rather are admissible evidence for your consideration, together with all the other evidence in this case.

(R. at 1451–52). GMC did not in its brief argue that the above instruction was erroneous.

 Therefore, in this case the federal motor vehicle safety standards were admissible as evidence of whether a manufacturer's conduct was reasonable; however, the jury did not have to find that the manufacturer's conduct was reasonable merely because it followed the federal motor vehicle safety standards.[7]

---

7. There have been a number of cases in which courts have found that the National Traffic and Motor Vehicle Safety Act, 15 U.S.C. § 1381 *et*

*seq.* preempts a state common law claim in certain situations. *E.g., Wood v. General Motors Corp.,* 865 F.2d 395 (1st Cir.1988), *cert. denied,*

Furthermore, the verdict was not plainly contrary to the weight of the evidence. GMC argues that the use of a combination lap and shoulder restraint system in the rear seat was merely a safety improvement, and manufacturers should not be made responsible to warn of all safety improvements which occur through the development of technology and research.[8] However, there was evidence that the use of the lap and shoulder belts in the rear seat of a car was not merely a safety improvement, but was a defect in 1978.

For instance, an expert stated that prior to 1978, GMC sold automobiles overseas which had lap and shoulder belts in the rear seat.[9] The evidence at trial further indicated that the medical community, scientific community and automobile manufacturers were aware that the use of lap and shoulder belts in the rear would reduce injuries, and that the lap-only belts did cause spinal and abdominal injuries. In fact, GMC wrote a letter to the National Highway Traffic Safety Administration in 1973 in which GMC noted that lap belts reduced injuries by 17% whereas lap and shoulder belts reduced injuries by 52%.[10] Therefore, there was evidence that GMC

knew or should have known in 1978 that the lap-only belts caused serious injuries which may have been prevented by the use of a shoulder and lap belt combination.

We acknowledge that GMC presented evidence which indicated that a concern in 1978 was that the lap and shoulder belt combination could cause injuries, particularly with children. Also, GMC presented evidence that not many people in the United States wore any type of safety restraining device in the 1970's. Therefore, car manufacturers did not see a need to install more equipment which would not be used. We recognize that GMC offered this evidence; however, it is not our role to resolve conflicting evidence.

As the Appellate Court of Illinois stated "[t]he determination of where the truth lies in conflicting testimony and the determination of the weight, if any, which should be accorded the witness' testimony are functions solely for the finder of fact." *Moehle v. Chrysler Motors Corp.*, 100 Ill. App.3d 353, 55 Ill.Dec. 774, 426 N.E.2d 1099, 1103 (1981), *aff'd*, 93 Ill.2d 299, 66 Ill.Dec. 649, 443 N.E.2d 575 (1982) (citations omitted). Therefore, we hold that the jury verdict was not plainly contrary to the weight of the evidence.[11]

494 U.S. 1065, 110 S.Ct. 1781, 108 L.Ed.2d 782 (1990). Although GMC's argument about the government not requiring lap and shoulder belts in rear seats until 1990 appears to be similar to the preemption argument, since GMC did not complain about the jury instruction regarding the Federal Motor Safety Standards or directly raise the preemption issue, we will not address the preemption issue in this opinion.

8. GMC cites to a number of cases to support its argument that a manufacturer is not responsible for warning about improved safety features. *See, e.g., Habecker v. Clark Equipment Co.*, 797 F.Supp. 381 (M.D.Pa.1992); *Estate of Kimmel v. Clark Equipment Co.*, 773 F.Supp. 828 (W.D.Va. 1991); and *Carrizales v. Rheem Manufacturing Co., Inc.*, 226 Ill.App.3d 20, 168 Ill.Dec. 169, 589 N.E.2d 569 (1991), *appeal denied*, 146 Ill.2d 623, 176 Ill.Dec. 794, 602 N.E.2d 448 (1992).

9. The following is an excerpt from the testimony of Ben Kelley, who was qualified as an expert:
Q. Prior to 1978, were lap shoulder belts required or widely used in other countries?
A. They were in some foreign jurisdictions, either required or widely used.
Q. Did General Motors make automobiles with lap shoulder belts in the rear to be sold in other countries overseas?
A. Yes, it did.
Q. Could you give me an example of one that they did?

A. Yes, General Motors owned and controlled the Opal manufacturing system which was a foreign car, but was owned by General Motors. The Opal was widely sold in European markets, and was equipped, where required—at least where required and possibly where not required, with lap shoulder belts in the rear outboard positions.
(R. at 587).

10. Below is an excerpt from the trial testimony of Ben Kelley:
A. The letter is a transmittal letter from David Martin who was then Manager of Automotive Safety Engineering for General Motors to the National Highway Traffic Safety Administration and dated July 23, 1973.
Q. Does that document contain data from General Motors on the effectiveness of lap shoulder belts in reducing injuries?
A. It does.
Q. And what is the percentage of effectiveness assigned to lap only belts in reducing injuries?
A. The prevention estimate ... of this General Motors study [is] ... that lap shoulder belts have a potential injury prevention estimate of 52, and lap belts have one of 17.
(R. at 691–92).

11. The Tenth Circuit has held that a jury could find that the absence of a shoulder restraint device in the rear seats created an unreasonable risk of harm. *Fox v. Ford Motor Co.*, 575 F.2d 774 (10th Cir.1978). For additional information

### B.

Second, we address GMC's contention that the trial court erred in qualifying Ben Kelley to testify as an expert in the areas of auto restraint systems, history of auto restraint systems, and the state-of-the-art restraint systems. GMC also contends that it was error for the trial court to allow Mr. Kelley to read to the jury portions from documents which he had reviewed.

 This Court has clearly stated that " " "[w]hether a witness is qualified to state an opinion is a matter which rests within the discretion of the trial court and its ruling on that point will not ordinarily be disturbed unless it clearly appears that its discretion has been abused." Point 5, syllabus, *Overton v. Fields*, 145 W.Va. 797 [117 S.E.2d 598 (1960) ].' Syllabus Point 4, *Hall v. Nello Teer Co.*, 157 W.Va. 582, 203 S.E.2d 145 (1974)." Syl. pt. 12, *Board of Education of McDowell County v. Zando, Martin & Milstead, Inc.*, 182 W.Va. 597, 390 S.E.2d 796 (1990).[12] In the case before us the record does not indicate that the trial court erred in allowing Mr. Kelley to testify in the manner described.

Mr. Kelley has held various jobs which concerned product injuries. For instance, at the time of trial he was President of A.B. Kelley Corp., a consulting agency which studies product safety and product injury production. He was also President of the Institute for Injury Reduction which is a nonprofit research and education group which addresses issues involving product-related injuries. In the past, Mr. Kelley has been Senior Vice President of the Insurance Institute for Highways and has served as a policy advisor to the Motor Vehicle and Highway Safety Bureau Director and the Federal Highway Administration.

Mr. Kelley's job history indicates that he has knowledge about the safety of auto restraint systems. Therefore, we affirm the trial court's decision to qualify Mr. Kelley as an expert witness.

 GMC also contends that the trial court erred when it allowed Mr. Kelley to read to the jury portions from documents which he had reviewed. In syllabus point 4 of *Ventura v. Winegardner*, 178 W.Va. 82, 357 S.E.2d 764 (1987) this Court held that "[a]n expert may base his opinion on a professional treatise or publication, but must first show the authoritative nature of the work." Furthermore, *W.Va.R.Evid.* 803(18) states:

> (18) *Learned Treatises.*—To the extent called to the attention of an expert witness upon cross-examination or relied upon by him in direct examination, statements contained in public treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. If admitted, the statements may be read into evidence but may not be received as exhibits.

The record indicates that Mr. Kelley read articles by various specialists such as medical doctors and automotive engineers. These articles did give insight as to what the various specialists knew about safety restraint systems in the 1960's and 1970's.

 Furthermore, we have also held that " '[r]ulings on the admissibility of evidence are largely within a trial court's sound discretion and should not be disturbed unless there has been an abuse of discretion.' *State v. Louk*, 171 W.Va. 639, [643,] 301 S.E.2d 596, 599 (1983)." Syl. pt. 2, *State v. Peyatt*, 173 W.Va. 317, 315 S.E.2d 574 (1983). The trial court did not err when allowing Mr. Kelley to read portions of various publications to the jury.

### C.

 Third, we address GMC's contention that the trial court erred by not allowing the jury to view the Johnsons' vehicle. The Johnsons state that since the time of their

---

on the manufacturer's liability for defective seatbelts see 7 *American Law of Products Liability 3d* § 95:144 (Timothy E. Travers, ed. 1988).

**12.** We noted in the *Zando* case that the "[a]doption of W.Va.R.Evid. 702 did not affect the well-settled rule of our prior law which was stated in Syllabus Point 4 of *Hall v. Nello Teer Co.*, 157 W.Va. 582, 203 S.E.2d 145 (1974)[.]" *Id.* at 612, 390 S.E.2d at 811. Therefore, it is still in the discretion of the trial court to determine whether a witness is qualified to state an opinion, and we will not disturb the trial court's ruling on that point unless it abused its discretion.

**250**

accident their vehicle had been exposed to flood conditions and other conditions which changed the appearance of the vehicle. The Johnsons also contend that the photographs and models used at trial were sufficient.

 " 'The allowance of a view by a jury is within the discretion of the trial court, and its refusal is not ground for reversal unless it is clearly manifest that a view was necessary to a just decision, and that the refusal operated to the injury of the party asking it.' Point 4, Syllabus, *Compton v. The County Court of Marshall County,* 83 W.Va. 745 [99 S.E. 85]." Syl. pt. 4, *Daugherty v. Baltimore & Ohio R.R. Co.,* 135 W.Va. 688, 64 S.E.2d 231 (1951). GMC has not shown that a view was necessary for a just decision. Therefore, we affirm the ruling of the trial court.

### IV.

Accordingly, after reviewing the record in this case, we hold that the trial court erred when it set-off the settlements the Johnsons received from the Estate of Bradley Bland and State Farm prior to trial since the jury was able to apportion the damages in this crashworthiness case. Additionally, it was error for the trial court to set-off the settlement from the underinsurance company since the collateral source rule applies to underinsurance benefits.

However, we decline to reverse the jury verdict even if the trial court's instruction on the post-sale duty to warn would be erroneous since there was another theory of liability, which is supported by the evidence, which the jury could use to find GMC liable. We also find that the trial court did not abuse its discretion by allowing Ben Kelley to testify as an expert by reading to the jury portions of the material he relied on in forming his opinion. Nor did the trial court abuse its discretion when not allowing a jury view of the Johnson's car.

Affirmed, in part, reversed, in part.